# FIBREBOARD PAPER PRODUCTS CORP. *v.* NATIONAL LABOR RELATIONS BOARD ET AL.

No. 14.  Argued October 19, 1964.—Decided
December 14, 1964.

*Marion B. Plant* argued the cause for petitioner. With him on the briefs was *Gerard D. Reilly.*

*Solicitor General Cox* argued the cause for respondent National Labor Relations Board. With him on the brief were *Arnold Ordman, Dominick L. Manoli* and *Norton J. Come.*

*David E. Feller* argued the cause for respondents United Steelworkers of America et al. With him on the brief were *Elliot Bredhoff, Jerry D. Anker, Michael H. Gottesman* and *Jay Darwin.*

Briefs of *amici curiae,* urging reversal, were filed by *Eugene Adams Keeney* and *James W. Hunt* for the Chamber of Commerce of the United States; *Lambert H. Miller* for the National Association of Manufacturers of the United States; and *John B. Olverson* for the Electronic Industries Association.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

This case involves the obligation of an employer and the representative of his employees under §§ 8 (a)(5), 8 (d) and 9 (a) of the National Labor Relations Act to "confer in good faith with respect to wages, hours, and other terms and conditions of employment."[1] The primary issue is whether the "contracting out" of work being

---

[1] The relevant provisions of the National Labor Relations Act, as amended, are:

"SEC. 8. (a) It shall be an unfair labor practice for an employer—

.     .     .     .     .

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9 (a). . . .

.     .     .     .     .

"(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms

performed by employees in the bargaining unit is a statutory subject of collective bargaining under those sections.

Petitioner, Fibreboard Paper Products Corporation (the Company), has a manufacturing plant in Emeryville, California. Since 1937 the East Bay Union Machinists, Local 1304, United Steelworkers of America, AFL–CIO (the Union) has been the exclusive bargaining representative for a unit of the Company's maintenance employees. In September 1958, the Union and the Company entered the latest of a series of collective bargaining agreements which was to expire on July 31, 1959. The agreement provided for automatic renewal for another year unless one of the contracting parties gave 60 days' notice of a desire to modify or terminate the contract. On May 26, 1959, the Union gave timely notice of its desire to modify the contract and sought to arrange a bargaining session with Company representatives. On June 2, the Company acknowledged receipt of the Union's notice and stated: "We will contact you at a later date regarding a meeting for this purpose." As required by the contract, the Union sent a list of proposed modifications on June 15. Efforts by the Union to schedule a bargaining session met with no success until July 27,

and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession . . . .

.        .        .        .        .

"Sec. 9. (a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . ."

four days before the expiration of the contract, when the Company notified the Union of its desire to meet.

The Company, concerned with the high cost of its maintenance operation, had undertaken a study of the possibility of effecting cost savings by engaging an independent contractor to do the maintenance work. At the July 27 meeting, the Company informed the Union that it had determined that substantial savings could be effected by contracting out the work upon expiration of its collective bargaining agreements with the various labor organizations representing its maintenance employees. The Company delivered to the Union representatives a letter which stated in pertinent part:

"For some time we have been seriously considering the question of letting out our Emeryville maintenance work to an independent contractor, and have now reached a definite decision to do so effective August 1, 1959.

"In these circumstances, we are sure you will realize that negotiation of a new contract would be pointless. However, if you have any questions, we will be glad to discuss them with you."

After some discussion of the Company's right to enter a contract with a third party to do the work then being performed by employees in the bargaining unit, the meeting concluded with the understanding that the parties would meet again on July 30.

By July 30, the Company had selected Fluor Maintenance, Inc., to do the maintenance work. Fluor had assured the Company that maintenance costs could be curtailed by reducing the work force, decreasing fringe benefits and overtime payments, and by preplanning and scheduling the services to be performed. The contract provided that Fluor would:

"furnish all labor, supervision and office help required for the performance of maintenance work . . . at

the Emeryville plant of Owner as Owner shall from time to time assign to Contractor during the period of this contract; and shall also furnish such tools, supplies and equipment in connection therewith as Owner shall order from Contractor, it being understood however that Owner shall ordinarily do its own purchasing of tools, supplies and equipment."

The contract further provided that the Company would pay Fluor the costs of the operation plus a fixed fee of $2,250 per month.

At the July 30 meeting, the Company's representative, in explaining the decision to contract out the maintenance work, remarked that during bargaining negotiations in previous years the Company had endeavored to point out through the use of charts and statistical information "just how expensive and costly our maintenance work was and how it was creating quite a terrific burden upon the Emeryville plant." He further stated that unions representing other Company employees "had joined hands with management in an effort to bring about an economical and efficient operation," but "we had not been able to attain that in our discussions with this particular Local." The Company also distributed a letter stating that "since we will have no employees in the bargaining unit covered by our present Agreement, negotiation of a new or renewed Agreement would appear to us to be pointless." On July 31, the employment of the maintenance employees represented by the Union was terminated and Fluor employees took over. That evening the Union established a picket line at the Company's plant.

The Union filed unfair labor practice charges against the Company, alleging violations of §§ 8 (a)(1), 8 (a)(3) and 8 (a)(5). After hearings were held upon a complaint issued by the National Labor Relations Board's Regional Director, the Trial Examiner filed an Inter-

mediate Report recommending dismissal of the complaint. The Board accepted the recommendation and dismissed the complaint. 130 N. L. R. B. 1558.

Petitions for reconsideration, filed by the General Counsel and the Union, were granted. Upon reconsideration, the Board adhered to the Trial Examiner's finding that the Company's motive in contracting out its maintenance work was economic rather than antiunion but found nonetheless that the Company's "failure to negotiate with . . . [the Union] concerning its decision to subcontract its maintenance work constituted a violation of Section 8 (a)(5) of the Act." [2] This ruling was based upon the doctrine established in *Town & Country Mfg. Co.*, 136 N. L. R. B. 1022, 1027, enforcement granted, 316 F. 2d 846 (C. A. 5th Cir. 1963), that contracting out work, "albeit for economic reasons, is a matter within the statutory phrase 'other terms and conditions of employment' and is a mandatory subject of collective bargaining within the meaning of Section 8 (a)(5) of the Act."

The Board ordered the Company to reinstitute the maintenance operation previously performed by the employees represented by the Union, to reinstate the employees to their former or substantially equivalent positions with back pay computed from the date of the Board's supplemental decision, and to fulfill its statutory obligation to bargain.

On appeal, the Court of Appeals for the District of Columbia Circuit granted the Board's petition for enforcement. 116 U. S. App. D. C. 198, 322 F. 2d 411. Because of the importance of the issues and because of an alleged

---

[2] The Board did not disturb its original holding that the Company had not violated § 8 (a)(1) or § 8 (a)(3), or its holding that the Company had satisfied its obligation to bargain about termination pay.

conflict among the courts of appeals,[3] we granted certiorari limited to a consideration of the following questions:

"1. Was Petitioner required by the National Labor Relations Act to bargain with a union representing some of its employees about whether to let to an independent contractor for legitimate business reasons the performance of certain operations in which those employees had been engaged?

"3. Was the Board, in a case involving only a refusal to bargain, empowered to order the resumption of operations which had been discontinued for legitimate business reasons and reinstatement with back pay of the individuals formerly employed therein?"

We agree with the Court of Appeals that, on the facts of this case, the "contracting out" of the work previously performed by members of an existing bargaining unit is a subject about which the National Labor Relations Act requires employers and the representatives of their employees to bargain collectively. We also agree with the Court of Appeals that the Board did not exceed its remedial powers in directing the Company to resume its maintenance operations, reinstate the employees with back pay, and bargain with the Union.

## I.

Section 8 (a)(5) of the National Labor Relations Act provides that it shall be an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." Collective bargaining is defined in § 8 (d) as

"the performance of the mutual obligation of the employer and the representative of the employees

---

[3] *Labor Board* v. *Adams Dairy, Inc.*, 322 F. 2d 553 (C. A. 8th Cir. 1963), *post*, p. 644.

to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment."

"Read together, these provisions establish the obligation of the employer and the representative of its employees to bargain with each other in good faith with respect to 'wages, hours, and other terms and conditions of employment . . . .' The duty is limited to those subjects, and within that area neither party is legally obligated to yield. *Labor Board* v. *American Ins. Co.*, 343 U. S. 395. As to other matters, however, each party is free to bargain or not to bargain . . . ." *Labor Board* v. *Wooster Div. of Borg-Warner Corp.*, 356 U. S. 342, 349. Because of the limited grant of certiorari, we are concerned here only with whether the subject upon which the employer allegedly refused to bargain—contracting out of plant maintenance work previously performed by employees in the bargaining unit, which the employees were capable of continuing to perform—is covered by the phrase "terms and conditions of employment" within the meaning of § 8 (d).

The subject matter of the present dispute is well within the literal meaning of the phrase "terms and conditions of employment." See *Order of Railroad Telegraphers* v. *Chicago & N. W. R. Co.*, 362 U. S. 330. A stipulation with respect to the contracting out of work performed by members of the bargaining unit might appropriately be called a "condition of employment." The words even more plainly cover termination of employment which, as the facts of this case indicate, necessarily results from the contracting out of work performed by members of the established bargaining unit.

The inclusion of "contracting out" within the statutory scope of collective bargaining also seems well designed to effectuate the purposes of the National Labor Relations

Act. One of the primary purposes of the Act is to promote the peaceful settlement of industrial disputes by subjecting labor-management controversies to the mediatory influence of negotiation.[4] The Act was framed with an awareness that refusals to confer and negotiate had been one of the most prolific causes of industrial strife. *Labor Board* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 42–43. To hold, as the Board has done, that contracting out is a mandatory subject of collective bargaining would promote the fundamental purpose of the Act by bringing a problem of vital concern to labor and management within the framework established by Congress as most conducive to industrial peace.

The conclusion that "contracting out" is a statutory subject of collective bargaining is further reinforced by industrial practices in this country. While not determinative, it is appropriate to look to industrial bargaining practices in appraising the propriety of including a particular subject within the scope of mandatory bargaining.[5] *Labor Board* v. *American Nat. Ins. Co.*, 343 U. S. 395, 408. Industrial experience is not only reflective of the interests of labor and management in the subject matter but is also indicative of the amenability of such subjects to the collective bargaining process. Experience illustrates that contracting out in one form or another has been brought, widely and successfully, within the collective bargaining framework.[6] Provisions relating to contracting out exist in numerous collective bargaining

---

[4] See declaration of policy set forth in §§ 1 and 101 of the Labor-Management Relations Act, 1947, 61 Stat. 136, 29 U. S. C. §§ 141, 151 (1958 ed.).

[5] See Cox and Dunlop, Regulation of Collective Bargaining by the National Labor Relations Board, 63 Harv. L. Rev. 389, 405–406 (1950).

[6] See Lunden, Subcontracting Clauses in Major Contracts, Pts. 1, 2, 84 Monthly Lab. Rev. 579, 715 (1961).

agreements,[7] and "[c]ontracting out work is the basis of many grievances; and that type of claim is grist in the mills of the arbitrators." *United Steelworkers* v. *Warrior & Gulf Nav. Co.*, 363 U. S. 574, 584.

The situation here is not unlike that presented in *Local 24, Teamsters Union* v. *Oliver*, 358 U. S. 283, where we held that conditions imposed upon contracting out work to prevent possible curtailment of jobs and the undermining of conditions of employment for members of the bargaining unit constituted a statutory subject of collective bargaining. The issue in that case was whether state antitrust laws could be applied to a provision of a collective bargaining agreement which fixed the minimum rental to be paid by the employer motor carrier who leased vehicles to be driven by their owners rather than the carrier's employees. We held that the agreement was upon a subject matter as to which federal law directed the parties to bargain and hence that state antitrust laws could not be applied to prevent the effectuation of the agreement. We pointed out that the agreement was a

"direct frontal attack upon a problem thought to threaten the maintenance of the basic wage structure established by the collective bargaining contract. The inadequacy of a rental which means that the owner makes up his excess costs from his driver's wages not only clearly bears a close relation to labor's efforts to improve working conditions but is in fact of vital concern to the carrier's employed drivers; an inadequate rental might mean the progressive cur-

[7] A Department of Labor study analyzed 1,687 collective bargaining agreements, which applied to approximately 7,500,000 workers (about one-half of the estimated work force covered by collective bargaining agreements). Among the agreements studied, approximately one-fourth (378) contained some form of a limitation on subcontracting. Lunden, *supra*, at 581.

tailment of jobs through withdrawal of more and more carrier-owned vehicles from service." *Id.*, at 294.

Thus, we concluded that such a matter is a subject of mandatory bargaining under § 8 (d). *Id.*, at 294–295. The only difference between that case and the one at hand is that the work of the employees in the bargaining unit was let out piecemeal in *Oliver*, whereas here the work of the entire unit has been contracted out. In reaching the conclusion that the subject matter in *Oliver* was a mandatory subject of collective bargaining, we cited with approval *Timken Roller Bearing Co.*, 70 N. L. R. B. 500, 518, *enforcement denied on other grounds*, 161 F. 2d 949 (C. A. 6th Cir. 1947), where the Board in a situation factually similar to the present case held that §§ 8 (a)(5) and 9 (a) required the employer to bargain about contracting out work then being performed by members of the bargaining unit.

The facts of the present case illustrate the propriety of submitting the dispute to collective negotiation. The Company's decision to contract out the maintenance work did not alter the Company's basic operation. The maintenance work still had to be performed in the plant. No capital investment was contemplated; the Company merely replaced existing employees with those of an independent contractor to do the same work under similar conditions of employment. Therefore, to require the employer to bargain about the matter would not significantly abridge his freedom to manage the business.

The Company was concerned with the high cost of its maintenance operation. It was induced to contract out the work by assurances from independent contractors that economies could be derived by reducing the work force, decreasing fringe benefits, and eliminating overtime payments. These have long been regarded as matters

peculiarly suitable for resolution within the collective bargaining framework, and industrial experience demonstrates that collective negotiation has been highly successful in achieving peaceful accommodation of the conflicting interests. Yet, it is contended that when an employer can effect cost savings in these respects by contracting the work out, there is no need to attempt to achieve similar economies through negotiation with existing employees or to provide them with an opportunity to negotiate a mutually acceptable alternative. The short answer is that, although it is not possible to say whether a satisfactory solution could be reached, national labor policy is founded upon the congressional determination that the chances are good enough to warrant subjecting such issues to the process of collective negotiation.

The appropriateness of the collective bargaining process for resolving such issues was apparently recognized by the Company. In explaining its decision to contract out the maintenance work, the Company pointed out that in the same plant other unions "had joined hands with management in an effort to bring about an economical and efficient operation," but "we had not been able to attain that in our discussions with this particular Local." Accordingly, based on past bargaining experience with this union, the Company unilaterally contracted out the work. While "the Act does not encourage a party to engage in fruitless marathon discussions at the expense of frank statement and support of his position," *Labor Board* v. *American Nat. Ins. Co.*, 343 U. S. 395, 404, it at least demands that the issue be submitted to the mediatory influence of collective negotiations. As the Court of Appeals pointed out, "[i]t is not necessary that it be likely or probable that the union will yield or supply a feasible solution but rather that the union be afforded an opportunity to meet management's legitimate complaints that its maintenance was unduly costly."

We are thus not expanding the scope of mandatory bargaining to hold, as we do now, that the type of "contracting out" involved in this case—the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment—is a statutory subject of collective bargaining under § 8 (d). Our decision need not and does not encompass other forms of "contracting out" or "subcontracting" which arise daily in our complex economy.[8]

## II.

The only question remaining is whether, upon a finding that the Company had refused to bargain about a matter which is a statutory subject of collective bargaining, the Board was empowered to order the resumption of maintenance operations and reinstatement with back pay. We believe that it was so empowered.

Section 10 (c) provides that the Board, upon a finding that an unfair labor practice has been committed,

> "shall issue . . . an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this Act . . . ."[9]

---

[8] As the Solicitor General points out, the terms "contracting out" and "subcontracting" have no precise meaning. They are used to describe a variety of business arrangements altogether different from that involved in this case. For a discussion of the various types of "contracting out" or "subcontracting" arrangements, see Brief for Respondent, pp. 13–17; Brief for Electronic Industries Association as *amicus curiae,* pp. 5–10.

[9] Section 10 (c) provides in pertinent part: "If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person

That section "charges the Board with the task of devising remedies to effectuate the policies of the Act." *Labor Board* v. *Seven-Up Bottling Co.,* 344 U. S. 344, 346. The Board's power is a broad discretionary one, subject to limited judicial review. *Ibid.* "[T]he relation of remedy to policy is peculiarly a matter for administrative competence . . . ." *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 194. "In fashioning remedies to undo the effects of violations of the Act, the Board must draw on enlightenment gained from experience." *Labor Board* v. *Seven-Up Bottling Co.,* 344 U. S. 344, 346. The Board's order will not be disturbed "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Elec. & Power Co.* v. *Labor Board,* 319 U. S. 533, 540. Such a showing has not been made in this case.

There has been no showing that the Board's order restoring the *status quo ante* to insure meaningful bargaining is not well designed to promote the policies of the Act. Nor is there evidence which would justify disturbing the Board's conclusion that the order would not impose an undue or unfair burden on the Company.[10]

---

an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this Act . . . . No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause. . . ."

[10] The Board stated: "We do not believe that requirement [restoring the *status quo ante*] imposes an undue or unfair burden on Respondent. The record shows that the maintenance operation is still being performed in much the same manner as it was prior to the subcontracting arrangement. Respondent has a continuing need for the services of maintenance employees; and Respondent's subcontract is terminable at any time upon 60 days' notice." 138 N. L. R. B., at 555, n. 19.

It is argued, nonetheless, that the award exceeds the Board's powers under § 10 (c) in that it infringes the provision that "[n]o order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause. . . ." The legislative history of that provision indicates that it was designed to preclude the Board from reinstating an individual who had been discharged because of misconduct.[11] There is no indication, however, that it was designed to curtail the Board's power in fashioning remedies when the loss of employment stems directly from an unfair labor practice as in the case at hand.

The judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE GOLDBERG took no part in the consideration or decision of this case.

MR. JUSTICE STEWART, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE HARLAN join, concurring.

Viewed broadly, the question before us stirs large issues. The Court purports to limit its decision to "the

---

[11] The House Report states that the provision was "intended to put an end to the belief, now widely held and certainly justified by the Board's decisions, that engaging in union activities carries with it a license to loaf, wander about the plants, refuse to work, waste time, break rules, and engage in incivilities and other disorders and misconduct." H. R. Rep. No. 245, 80th Cong., 1st Sess., 42 (1947). The Conference Report notes that under § 10 (c) "employees who are discharged or suspended for interfering with other employees at work, whether or not in order to transact union business, or for engaging in activities, whether or not union activities, contrary to shop rules, or for Communist activities, or for other cause [interfering with war production] . . . will not be entitled to reinstatement." H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 55 (1947).

facts of this case." But the Court's opinion radiates implications of such disturbing breadth that I am persuaded to file this separate statement of my own views.

Section 8 (a)(5) of the National Labor Relations Act, as amended, makes it an unfair labor practice for an employer to "refuse to bargain collectively with the representatives of his employees." Collective bargaining is defined in § 8 (d) as:

> "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment."

The question posed is whether the particular decision sought to be made unilaterally by the employer in this case is a subject of mandatory collective bargaining within the statutory phrase "terms and conditions of employment." That is all the Court decides.[1] The Court most assuredly does not decide that every managerial decision which necessarily terminates an individual's employment is subject to the duty to bargain. Nor does the Court decide that subcontracting decisions are as a general matter subject to that duty. The Court holds no more than that this employer's decision to subcontract this work, involving "the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment," is subject to the duty to bargain collectively. Within the narrow limitations implicit in the specific facts of this case, I agree with the Court's decision.

Fibreboard had performed its maintenance work at its Emeryville manufacturing plant through its own em-

---

[1] Except for the quite separate remedy issue discussed in Part II of the Court's opinion.

ployees, who were represented by a local of the United Steelworkers. Estimating that some $225,000 could be saved annually by dispensing with internal maintenance, the company contracted out this work, informing the union that there would be no point in negotiating a new contract since the employees in the bargaining unit had been replaced by employees of the independent contractor, Fluor. Maintenance work continued to be performed within the plant, with the work ultimately supervised by the company's officials and "functioning as an integral part" of the company. Fluor was paid the cost of operations plus $2,250 monthly. The savings in costs anticipated from the arrangement derived largely from the elimination of fringe benefits, adjustments in work scheduling, enforcement of stricter work quotas, and close supervision of the new personnel. Under the cost-plus arrangement, Fibreboard remained responsible for whatever maintenance costs were actually incurred. On these facts, I would agree that the employer had a duty to bargain collectively concerning the replacement of his internal maintenance staff by employees of the independent contractor.

The basic question is whether the employer failed to "confer in good faith with respect to . . . terms and conditions of employment" in unilaterally deciding to subcontract this work. This question goes to the scope of the employer's duty in the absence of a collective bargaining agreement.[2] It is true, as the Court's opinion

---

[2] There was a time when one might have taken the view that the National Labor Relations Act gave the Board and the courts no power to determine the subjects about which the parties must bargain—a view expressed by Senator Walsh when he said that public concern ends at the bargaining room door. 79 Cong. Rec. 7659 (1935). See Cox and Dunlop, Regulation of Collective Bargaining by the National Labor Relations Board, 63 Harv. L. Rev. 389. But too much law has been built upon a contrary assumption for this view any longer to prevail, and I question neither the power of the Court to decide this issue nor the propriety of its doing so.

points out, that industrial experience may be useful in determining the proper scope of the duty to bargain. See *Labor Board* v. *American Nat. Ins. Co.,* 343 U. S. 395, 408. But data showing that many labor contracts refer to subcontracting or that subcontracting grievances are frequently referred to arbitrators under collective bargaining agreements, while not wholly irrelevant, do not have much real bearing, for such data may indicate no more than that the parties have often considered it mutually advantageous to bargain over these issues on a permissive basis. In any event, the ultimate question is the scope of the duty to bargain defined by the statutory language.

It is important to note that the words of the statute are words of limitation. The National Labor Relations Act does not say that the employer and employees are bound to confer upon any subject which interests either of them; the specification of wages, hours, and other terms and conditions of employment defines a limited category of issues subject to compulsory bargaining. The limiting purpose of the statute's language is made clear by the legislative history of the present Act. As originally passed, the Wagner Act contained no definition of the duty to bargain collectively.[3] In the 1947 revision of the Act, the House bill contained a detailed but limited list of subjects of the duty to bargain, excluding all others.[4] In conference the present language was substituted for the House's detailed specification. While the language thus incorporated in the 1947 legislation as

---

[3] However, it did recognize that the party designated by a majority of employees in a bargaining unit shall be their exclusive representative "for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment." § 9 (a).

[4] H. R. 3020, 80th Cong., 1st Sess., § 2 (11) (B) (vi) (1947), in I Legislative History of the Labor Management Relations Act, 1947, at 166–167 (1948). (Hereinafter LMRA.)

enacted is not so stringent as that contained in the House bill, it nonetheless adopts the same basic approach in seeking to define a limited class of bargainable issues.[5]

The phrase "conditions of employment" is no doubt susceptible of diverse interpretations. At the extreme, the phrase could be construed to apply to any subject which is insisted upon as a prerequisite for continued employment. Such an interpretation, which would in effect place the compulsion of the Board behind any and all bargaining demands, would be contrary to the intent of Congress, as reflected in this legislative history. Yet there are passages in the Court's opinion today which suggest just such an expansive interpretation, for the Court's opinion seems to imply that any issue which may reasonably divide an employer and his employees must be the subject of compulsory collective bargaining.[6]

Only a narrower concept of "conditions of employment" will serve the statutory purpose of delineating a limited category of issues which are subject to the duty to bargain collectively. Seeking to effect this purpose, at least seven circuits have interpreted.the statutory language to exclude various kinds of management decisions from the

---

[5] The conference report accompanying the bill said that although this section "did not prescribe a purely objective test of what constituted collective bargaining, as did the House bill, [it] had to a very substantial extent the same effect . . . ." I LMRA 538. Though this statement refers to the entire section, it is clear from the context that the focus of attention was upon the procedures of collective bargaining rather than its scope.

[6] The opinion of the Court seems to assume that the only alternative to compulsory collective bargaining is unremitting economic warfare. But to exclude subjects from the ambit of compulsory collective bargaining does not preclude the parties from seeking negotiations about them on a permissive basis. And there are limitations upon the use of economic force to compel concession upon subjects which are only permissively bargainable. *Labor Board* v. *Wooster Div. of Borg-Warner Corp.*, 356 U. S. 342.

scope of the duty to bargain.[7]   In common parlance, the conditions of a person's employment are most obviously the various physical dimensions of his working environment.   What one's hours are to be, what amount of work is expected during those hours, what periods of relief are available, what safety practices are observed, would all seem conditions of one's employment.   There are other less tangible but no less important characteristics of a person's employment which might also be deemed "conditions"—most prominently the characteristic involved in this case, the security of one's employment.   On one view of the matter, it can be argued that the question whether there is to be a job is not a condition of employment; the question is not one of imposing conditions on employment, but the more fundamental question whether there is to be employment at all.   However, it is clear that the Board and the courts have on numerous occasions recognized that union demands for provisions limiting an employer's power to discharge employees are mandatorily bargainable.   Thus, freedom from discriminatory discharge,[8] seniority rights,[9] the imposition of a compulsory retirement age,[10] have been recognized as subjects upon which an employer must bargain, although all of these concern the very existence of the employment itself.

---

[7] *Labor Board* v. *Adams Dairy*, 322 F. 2d 553 (C. A. 8th Cir. 1963); *Labor Board* v. *New England Web*, 309 F. 2d 696 (C. A. 1st Cir. 1962); *Labor Board* v. *Rapid Bindery*, 293 F. 2d 170 (C. A. 2d Cir. 1961); *Jays Foods* v. *Labor Board*, 292 F. 2d 317 (C. A. 7th Cir. 1961); *Labor Board* v. *Lassing*, 284 F. 2d 781 (C. A. 6th Cir. 1960); *Mount Hope Finishing Co.* v. *Labor Board*, 211 F. 2d 365 (C. A. 4th Cir. 1954); *Labor Board* v. *Houston Chronicle*, 211 F. 2d 848 (C. A. 5th Cir. 1954).

[8] *Labor Board* v. *Bachelder*, 120 F. 2d 574 (C. A. 7th Cir. 1941). See also *National Licorice Co.* v. *Labor Board*, 309 U. S. 350.

[9] *Labor Board* v. *Westinghouse Air Brake Co.*, 120 F. 2d 1004 (C. A. 3d Cir. 1941).

[10] *Inland Steel Co.* v. *Labor Board*, 170 F. 2d 247 (C. A. 7th Cir. 1948).

While employment security has thus properly been recognized in various circumstances as a condition of employment, it surely does not follow that every decision which may affect job security is a subject of compulsory collective bargaining. Many decisions made by management affect the job security of employees. Decisions concerning the volume and kind of advertising expenditures, product design, the manner of financing, and sales, all may bear upon the security of the workers' jobs. Yet it is hardly conceivable that such decisions so involve "conditions of employment" that they must be negotiated with the employees' bargaining representative.

In many of these areas the impact of a particular management decision upon job security may be extremely indirect and uncertain, and this alone may be sufficient reason to conclude that such decisions are not "with respect to . . . conditions of employment." Yet there are other areas where decisions by management may quite clearly imperil job security, or indeed terminate employment entirely. An enterprise may decide to invest in labor-saving machinery. Another may resolve to liquidate its assets and go out of business. Nothing the Court holds today should be understood as imposing a duty to bargain collectively regarding such managerial decisions, which lie at the core of entrepreneurial control. Decisions concerning the commitment of investment capital and the basic scope of the enterprise are not in themselves primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment. If, as I think clear, the purpose of § 8 (d) is to describe a limited area subject to the duty of collective bargaining, those management decisions which are fundamental to the basic direction of a corporate enterprise or which impinge only indirectly upon employment security should be excluded from that area.

224

Applying these concepts to the case at hand, I do not believe that an employer's subcontracting practices are, as a general matter, in themselves conditions of employment. Upon any definition of the statutory terms short of the most expansive, such practices are not conditions—tangible or intangible—of any person's employment.[11] The question remains whether this particular kind of subcontracting decision comes within the employer's duty to bargain. On the facts of this case, I join the Court's judgment, because all that is involved is the substitution of one group of workers for another to perform the same task in the same plant under the ultimate control of the same employer. The question whether the employer may discharge one group of workers and substitute another for them is closely analogous to many other situations within the traditional framework of collective bargaining. Compulsory retirement, layoffs according to seniority, assignment of work among potentially eligible groups within the plant—all involve similar questions of discharge and work assignment, and all have been recognized as subjects of compulsory collective bargaining.[12]

Analytically, this case is not far from that which would be presented if the employer had merely discharged all its employees and replaced them with other workers willing to work on the same job in the same plant without the various fringe benefits so costly to the company. While such a situation might well be considered a § 8 (a)(3) violation upon a finding that the employer discriminated against the discharged employees because of

---

[11] At least four circuits have held that subcontracting decisions are not subject to the duty to bargain. *Labor Board* v. *Adams Dairy,* 322 F. 2d 553 (C. A. 8th Cir. 1963); *Jays Foods* v. *Labor Board,* 292 F. 2d 317 (C. A. 7th Cir. 1961); *Labor Board* v. *Lassing,* 284 F. 2d 781 (C. A. 6th Cir. 1960); *Labor Board* v. *Houston Chronicle,* 211 F. 2d 848 (C. A. 5th Cir. 1954).

[12] See notes 7, 8, and 9, *supra.*

their union affiliation, it would be equally possible to regard the employer's action as a unilateral act frustrating negotiation on the underlying questions of work scheduling and remuneration, and so an evasion of its duty to bargain on these questions, which are concededly subject to compulsory collective bargaining.[13] Similarly, had the employer in this case chosen to bargain with the union about the proposed subcontract, negotiations would have inevitably turned to the underlying questions of cost, which prompted the subcontracting. Insofar as the employer frustrated collective bargaining with respect to these concededly bargaining issues by its unilateral act of subcontracting this work, it can properly be found to have violated its statutory duty under § 8 (a) (5).

This kind of subcontracting falls short of such larger entrepreneurial questions as what shall be produced, how capital shall be invested in fixed assets, or what the basic scope of the enterprise shall be. In my view, the Court's decision in this case has nothing to do with whether any aspects of those larger issues could under any circumstances be considered subjects of compulsory collective bargaining under the present law.

I am fully aware that in this era of automation and onrushing technological change, no problems in the domestic economy are of greater concern than those involving job security and employment stability. Because of the potentially cruel impact upon the lives and fortunes of the working men and women of the Nation, these problems have understandably engaged the solicitous attention of government, of responsible private business, and particularly of organized labor. It is possible that in meeting these problems Congress may eventually decide to give organized labor or government a far heavier hand

---

[13] *Labor Board* v. *United States Air Conditioning Corp.,* 302 F. 2d 280 (C. A. 1st Cir. 1962); *Labor Board* v. *Tak Trak, Inc.,* 293 F. 2d 270 (C. A. 9th Cir. 1961). Cf. *Labor Board* v. *Katz,* 369 U. S. 736.

in controlling what until now have been considered the prerogatives of private business management. That path would mark a sharp departure from the traditional principles of a free enterprise economy. Whether we should follow it is, within constitutional limitations, for Congress to choose. But it is a path which Congress certainly did not choose when it enacted the Taft-Hartley Act.