NEW CASTLE COUNTY VOCATIONAL
TECHNICAL EDUCATION
ASSOCIATION, Plaintiff,

v.

The BOARD OF EDUCATION OF the
NEW CASTLE COUNTY VOCATION-
AL TECHNICAL SCHOOL DISTRICT,
Defendant.

Court of Chancery of Delaware,
New Castle.

Submitted Sept. 2, 1982.

Decided Sept. 17, 1982.

Sheldon N. Sandler and Barry M. Wil-
loughby (argued), of Young, Conaway,
Stargatt & Taylor, Wilmington, for plain-
tiff.

Jeffrey M. Weiner of Bayard, Brill &
Handelman, Wilmington, for defendant.

LONGOBARDI, Vice Chancellor.

The New Castle County Vocational Technical Association ("Association") is the exclusive negotiating representative of the public school employees of the New Castle County Vocational Technical School District. On July 1, 1979, the Association entered into a collective bargaining agreement with the Board of Education of the New Castle County Vocational Technical School District ("Board"). Article 9 of that agreement concerns "Compensation and Fringe Benefits." Section 9:5.4 specifically addresses Blue Cross-Blue Shield benefits and reads in pertinent part, "State pays for individual membership and the district pays 100% of family plan beginning with employment." Article 21 concerning "Negotiation of Successor Agreement" deals with the apparent duration of the agreement with Section 21:1 and Section 21:2 discussing both the time frame for renegotiation of the contract and the effectiveness of the contract during the period of negotiation.

21:1. The parties agree to enter into negotiations over a successor Agreement in accordance with Chapter 40, Title 14, Delaware Code. Such negotiations shall begin upon mutual agreement no later than 90 days prior to the expiration of this Agreement. Such request to begin negotiations shall be initiated by the employees. Any agreement so negotiated shall apply to employees covered by this Agreement, be reduced to writing, and be submitted for ratification by the employees and the Board.

21:2. This Agreement shall be for a minimum period of three years from the effective date; and negotiations concerned with the terms of this Agreement shall not be reopened during that time except as provided for by this Agreement. This Agreement shall remain in effect until agreement is reached on a succeeding Agreement.

The final Article of the contract, Article 22, is entitled "Duration of Agreement" and discusses the chronological parameters of the agreement as well as the scope of the commitments it has created.

22:1. This Agreement shall be effective as of July 1, 1979 and shall continue in effect until June 30, 1982. This Agreement constitutes the full and complete commitments between the parties, and no subject, whether contained herein or not, shall be reopened for negotiation during the life of this Agreement except by mutual agreement of the parties. This Agreement shall not be extended orally; and it is expressly understood that it shall expire on the date indicated unless it is extended in writing.

Pursuant to Article 21 of the contract, the Board and Association entered into negotiations on a successor agreement on March 30, 1982. While negotiations were in progress, the District Superintendent, Dr. Conrad C. Shuman, sent letters to all the professional staff represented by the Association, but not to the Association itself, which informed them that the State Treasurer's Office had notified the Board of new rate increases for Blue Cross coverage effective July 1, 1982. The increases varied according to the type of coverage. The District's contribution for "individual" coverage was to increase by $2.26 per month, for "adult and child" coverage by $3.72 per month and for "family" coverage by $5.60 per month. Shuman noted that since the teacher contract expired June 30, 1982, "the costs could be passed on to the employee." The Board, however, was deferring the final decision on passing on the cost until the next regular school board meeting scheduled for September 15, 1982. The letter also noted that the benefit provision of the teacher contract "is a negotiable item and this memo is intended to point out that continued coverage under this program and any increased cost associated with the benefits is not assured." (Shuman affidavit, Exhibit B).

On August 13, 1982, the Association filed a complaint with this Court alleging that the District was "contemplating refusing to honor § 9:5.4 of the contract" (Complaint, ¶ 9) and praying for injunctive relief because its members would suffer irreparable harm by being "without health insurance

coverage" (Complaint, ¶ 12) if the District proceeded as threatened. The Association requests an order directing the Board to continue to pay the 1981–1982 health insurance rates as well as the increases effective July 1, 1982.

Plaintiff's argument is twofold. First, the Association contends that the language of Article 22 setting the expiration date of the contract as June 30, 1982, must be viewed in light of Article 21, specifically Section 21:1 which reads "[t]his Agreement shall remain in effect until agreement is reached on a succeeding agreement." The Association argues that the health insurance benefits, including post-expiration increases, should thereby be continued during negotiations. Considering the guarantee of 100% coverage of family plan benefits in Section 9:5.4, Plaintiff feels that the alleged threatened repudiation will irreparably harm a demonstrated contractual right.

Secondly, the Association argues that unilateral alteration of benefits by the Board prior to an impasse in negotiations violates federal standards of fair dealing which have been applied to the state statutes addressing public school employee negotiations by Delaware courts. Plaintiff cites *Milford Education Association v. Board of Education of the Milford School District,* Del.Super., 811 Civil Action 1976 (unreported decision of Taylor, J., dated February 24, 1977), in which Judge Taylor discussed two United States Supreme Court cases dealing with an employer's unilateral alteration, prior to impasse, of matters which are the subject of current negotiations. These cases, *N.L.R.B. v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), and *Fibreboard Corp. v. NLRB,* 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), prohibit such unilateral alteration prior to impasse. Judge Taylor found the "principles of fair dealing" established by these cases applicable to the standards for good faith negotiation contemplated by 14 *Del.C.* Ch. 40. Additionally, the Association relies on a decision by the then Vice Chancellor Brown which relies in part on Judge Taylor's opinion in *Milford Education Association v. Board of Education,* 811 Civil Action 1976.

In *Caesar Rodney Education Association v. The Board of Education of Caesar Rodney School District,* Del.Ch., Civil Action No. 5635 (unreported decision of Brown, V.C., dated July 5, 1978), Chancellor Brown granted in part a temporary restraining order against that Board prohibiting them from terminating existing Blue Cross benefits available under the expired contract in an effort to maintain the status quo during negotiations which had not yet reached impasse. These cases, the Association insists, support an injunction prohibiting any possible alteration of its members' health coverage including post-expiration increases which the Board has voluntarily paid and which the Board now wishes to reconsider. It is this interference with the right of "fair dealing" which the Plaintiff contends is a basis for preliminary injunctive relief in order to maintain the status quo.

The Board responds to the Association first by arguing that this Court has no jurisdiction because the Association is effectively asking the Board to bargain in good faith as required by 14 *Del.C.* § 4008 and that compelling the Board to perform what the defense characterizes as an "administrative function" is properly achieved by a request for mandamus filed in Superior Court. The Board cites *Capital Educators Association v. Camper,* Del.Ch., 320 A.2d 782 (1974), for this proposition, a case in which then Vice Chancellor Brown denied a preliminary injunction aimed at getting the school board to sit down at the bargaining table because they were under a clear legal duty to do so, a duty enforceable at law not in equity.

The Board next argues that if the Court does in fact have jurisdiction, it should not act to maintain the status quo as defined by the Association. In fact, the Board seems to feel that the case reduces to a matter of contract interpretation and not an effort, as the Association suggests, of an employer putting unfair bargaining pressures on its employees. As a matter of fact, as the defense notes, the Board has voluntarily paid the increased health insurance rates and continues to do so. It does not feel,

however, that any interpretation of the contract requires it to contribute more than it did during the 1981–1982 school year. Both sides agree that continued contribution by the Board for its approximately three hundred employees, nearly two-thirds of whom maintain family coverage, would amount to a more than $15,000 annual increase in cost to the District. As the Board views the "status quo" under the contract, the language of Section 22:1 at minimum freezes obligations owed as of June 30, 1982. Section 21:2, which keeps the agreement in effect during negotiations, at most maintains the 1981–1982 level of payments and does not incorporate increases occurring after the expiration date of the old agreement.

The Board does not contest the applicability of federal standards prohibiting unilateral changes by employers prior to impasse, as adopted by Judge Taylor in *Milford Education Association v. Board of Education*, 811 Civil Action 1976, to the current case. It does not agree, though, that the case of *Caesar Rodney Education Asso. v. The Board of Education*, Civil Action No. 5635, supports the Plaintiff's theory of what it contends is the status quo. In that case, the court prohibited the nonpayment of existing Blue Cross coverage when the contract expired but did not prohibit the school board from refusing to enter a new contract providing dental insurance since that payment would bind the board to a commitment of increased benefits beyond the status quo. The Board denies it has ever threatened to terminate all health care benefits and, in both its briefs and in Dr. Shuman's affidavit, it insists that only the continued payment of the 1982–1983 increase will be considered at the next regular board meeting.

The standards for granting a preliminary injunction are well established. Chancellor Quillen, now Justice Quillen, in *Gimbel v. Signal Companies, Inc.,* Del.Ch., 316 A.2d 599, 602 (1974), collated the various standards and principles in determining whether injunctive relief should issue.

In exercising its discretion, the Court must ask itself two familiar questions, which have long constituted the backdrop for evaluating the merits of any plaintiff's plea for a preliminary injunction.

Stated briefly, the first question is: "Has the plaintiff satisfied the Court that there is a reasonable probability of his ultimate success on final hearing?"

\* \* \* \* \* \*

The second question can be stated as follows: "Has the plaintiff satisfied the Court that he will suffer irreparable injury if the Court fails to issue the requested preliminary injunction?"

\* \* \* \* \* \*

"An injunction, being the 'strong arm of equity' should never be granted except in a clear case of irreparable injury, and with full conviction on the part of the court of its urgent necessity." [at Sec. 22].

See also, *Bayard v. Martin,* 34 Del.Ch. 184, 193, 101 A.2d 329, 334 (Supr.Ct.1953), cert. den. 347 U.S. 944, 74 S.Ct. 639, 98 L.Ed. 1092 (1954). *Consolidated Fisheries Co. v. Consolidated Solubles Co.,* 34 Del.Ch. 24, 99 A.2d 253 (Supr.Ct. 1953).

Moreover, this second question of irreparable injury to the plaintiff should injunctive relief be denied has a corollary which requires the Court to consider potential hardship to the defendant. In this regard, Judge Rodney once wrote:

"In the exercise of a sound judicial discretion in the award or denial of a preliminary injunction, the court should balance the conveniences to the parties and the possible injuries to them according as they may be affected by the granting or the withholding of the injunction. *Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, [674–75] 88 L.Ed. 834."

*Aldridge v. Franco Wyoming Oil Co.,* 9 F.R.D. 278, 279 (D.Del.1949). See also *Pauley Petroleum, Inc. v. Continental Oil Co.,* 43 Del.Ch. 366, 231 A.2d 450 (Ch. 1967), *aff'd.* 43 Del.Ch. 516, 239 A.2d 629 (Supr.Ct.1968); High on Injunctions, *supra,* at Sec. 13.

And, it is the plaintiff's duty to "tip" that balance:

"While the relative convenience and inconvenience of the parties will prompt courts to consider questions of harm in exercising the discretionary power of injunction, yet a probable case must asways [sic] be made out in support of the moving side before the writ will issue."

As indicated earlier, before a Court issues an injunction, the Court should be convinced of its "urgent necessity." Chancellor Brown referring to *Gimbel v. Signal Companies, Inc.,* 316 A.2d 599, stated, " . . . the power to enjoin challenged conduct prior to a full evidentiary hearing constitutes the strong arm of equity jurisdiction, and should never be utilized unless a clear case of imminent, irreparable injury is presented . . . ." *Petty v. Penntech Papers, Inc.,* Del. Ch., 347 A.2d 140, 141 (1975).

■ Clearly, it is not necessary that a wrong should have actually been committed before a court of equity interferes since such a requirement should, in most cases, defeat the purpose for which relief is sought. *Wilmington Federation of Teachers v. Howell,* Del.Supr., 374 A.2d 832, 836 (1977). Nevertheless, the threat of an illegal action, such as an illegal strike, must be imminent to justify injunctive relief. *State v. Delaware State Educational Association,* Del.Ch., 326 A.2d 868, 873 (1974); *Wilmington Federation of Teachers v. Howell,* 374 A.2d at 836.

■ On the facts before the Court, it is evident that the Plaintiff has not demonstrated that the injury it is about to suffer may be imminent. Plaintiff alleges that the Board is on the verge of stopping payment for the increased 1982–1983 health insurance costs or, alternatively, discontinuing all health insurance payments and possibly other benefits owed to Association members. Despite the admittedly ambiguous language of Superintendent Shuman's letter of June 30, 1982, it now appears certain, after oral argument, that the Board has no intention of revoking the 1981–1982 level of payments. Moreover, though the

possibility exists that the increases paid by the Board since July 1, 1982, may be discontinued, the mere possibility that the Board will stop payment is not convincing evidence of the urgency of this matter. Additionally, as noted by letter of counsel after oral argument on the motion, even if the Board voted to terminate its payments, the employees' benefits would not be affected until sometime after December, 1982. With negotiations continuing even now, it seems unnecessary and unwise for this Court to interject itself into the bargaining process to protect rights that are so far untouched and which will, in any event, remain intact until after December, 1982. In *State v. Delaware State Education Association,* 326 A.2d 868, Justice (then Chancellor) Quillen refused to enjoin an allegedly threatened teachers strike because the teachers were reporting to work and were then not engaged in illegal activity. A pattern of legal conduct convinced the Chancellor that "[t]he broad injunction sought by the State (was) not based on a current situation of mass illegality but rather on a current situation of uncertainty which does not lend itself to specific relief." *Id.* at 876.

In the present case, the Board continues to pay Blue Cross and Blue Shield coverage at 1981–1982 levels and the increased 1982–1983 levels. Plaintiff's claim does not appear to be ripe. "An injunction should never be granted except . . . with full conviction on the part of the court of its urgent necessity." *High on Injunctions,* (4th Ed.) Vol. 1, Sec. 22; *see also, Bayard v. Martin,* Del.Supr., 101 A.2d 329, 334 (1953), *cert. den.,* 347 U.S. 944, 74 S.Ct. 639, 98 L.Ed. 1092 (1954). There is no evidence of urgent necessity to support such a conclusion in this case.

■ There is other evidence just as strong and convincing to this Court which prompts a denial of injunctive relief. The Court is not convinced that if a preliminary injunction is denied, the Plaintiff will suffer an irreparable injury. If the Board takes the extreme action of refusing to pay the insurance premiums at 1981–1982 levels,

the damages are easily identified and a money judgment will make the parties whole. If the Board refuses to pay the increased premiums for 1982–1983 coverage, again the damages are easily identified and a money judgment will make them whole. [It is important to note again at this juncture of the opinion that speculation about nonpayment relates only to the increased costs for 1982–1983]. Plaintiff argues that if these increased insurance premiums are not paid and the insurance lapses, a member of the union may suffer a catastrophic pecuniary loss if a serious illness or injury occurs after the policy lapses. There is that distinct possibility but the remedy is simple and inexpensive. At the most, if the Board does refuse to pay the increased premiums, individual members will be required to pay no more than $2.26 to $5.60 per month to keep their policies current. To this Court, such sums of money to maintain the status quo, to mitigate damages is not such a hardship for which injunctive relief should be granted. The parties have it within their immediate grasp at very little inconvenience or expense to prevent that possible catastrophe about which they have speculated. The Association contends that if the Board refuses to pay the increased premiums, the Board is interfering with a "legal right" which amounts to irreparable harm. At oral argument, the Court responded that isolating that principle from the context of case law in which it is found applicable serves Plaintiff no purpose. If every interference with a legal right amounted to irreparable injury for which injunctive relief would necessarily follow, then our law courts would have no civil actions. Every time somebody breaches a contract, there is an alleged interference with a legal right. The very case cited by the Plaintiff, *State v. Delaware State Education Association,* 326 A.2d 868, clarifies the appropriate use of the principle they wish this Court to accept, that is, equity will provide relief only when traditional equitable principles are present and when the legal remedies are not under the circumstances full, adequate and complete. See also, *Pomeroy's Equity Jurisprudence* (5th Ed.) § 139.

Another aspect of Plaintiff's argument on interference with a legal right concerns its allegations of unfair labor practices against the Board. The Association argues that applicable standards of labor law demonstrate that any unilateral change in benefits by the Board is unfair and injures the Association by undermining its bargaining position. It places all the economic pressure on them, they insist, particularly since under 14 *Del.C.* § 4011, the Association membership is prohibited from striking. This damage, they claim, is irreparable and intangible and thereby a proper basis for injunctive relief.

In *Milford Education Association v. Board of Education,* 811 Civil Action 1976, Judge Taylor felt compelled to resolve the question of unilateral change even though the issues were moot when the decision was written. The court cited two United States Supreme Court cases to support the view that unilateral alteration of negotiable items by an employer prior to bargaining impasse was an unfair labor practice. The federal cases, *N.L.R.B. v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 and *Fibreboard Corp. v. NLRB,* 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233, primarily deal with 29 *U.S.C.* §§ 158(a)(5), (d) and 159(a) of the National Labor Relations Act. These sections, in pertinent part, read:

§ 158. (a) It shall be unfair labor practice for an employer—

\* \* \* \* \* \*

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a) . . .

\* \* \* \* \* \*

(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder,

and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession . . . .

\* \* \* \* \* \*

§ 159. (a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . .

The *Milford Education* case concerned 14 *Del.C.* § 4008 and applied the federal interpretation of the federal act to a Delaware statute. Title 14, Section 4008 of the *Delaware Code* reads, in pertinent part, as follows:

(a) The board of education or its representatives and the exclusive negotiating representative of the public school employees, through their designated officials or representatives, and upon the request of either party, shall have the duty to negotiate in good faith with respect to salaries, employee benefits and working conditions.

(b) The board of education or its representative and the exclusive negotiating representative of the public school employees shall meet at reasonable times and confer in good faith with respect to the matters covered by subsection (a) of § 4006 of this title.

The statutes are alike in imposing a good faith obligation on employers and the exclusive negotiating representative of the public school employees to negotiate collectively on matters of salaries, benefits and working conditions. Though the Delaware statute does not designate refusals to bargain in good faith "unfair labor practices", a refusal under current case law would appear unfair. There is, therefore, sufficient similarity in language and purpose between the two statutes to allow adoption of those federal standards when it becomes necessary to prevent employers from undermining collective bargaining by simply changing the status quo of subjects to be negotiated rather than negotiating the changes with the union. In *Fibreboard Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233, management's unilateral "contracting out" of all work done by particular employees upon the contract expiration without even considering negotiating a new contract was unfair because it denied the union the chance of offering an alternative through the bargaining process. Similarly, an employer's unilateral increase in wages and benefits prior to a bargaining impasse was found to ignore the statutory objective of deciding working conditions through collective bargaining in *N.L.R.B. v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230. The union could not effectively bargain since its members would be divided over the merits of changes made by the company. *Id.* at 737, 82 S.Ct. at 1108. In this way, the unilateral action by the employer undermined the collective bargaining position of the union. The way to judge good faith, the court held, is to examine the objective result, not the subjective intent, and, if the changes by the employer appear to be an attempt to "circumvent the duty to negotiate (as) . . . much as does a flat refusal", then it is a bad faith act and an unfair labor practice. *Id.* at 743, 82 S.Ct. at 1111.

*Milford Educational Association v. Board of Education*, 811 Civil Action 1976, found these principles of good faith bargaining to apply with equal force under the Delaware statute when an employer school board voluntarily increased employee salaries during ongoing negotiations with their union. Vice Chancellor Brown found the same principles applicable to a school board's decision to terminate Blue Cross benefits it had been paying under an expired contract when a new contract was being negotiated. *Caesar Rodney Education Asso. v. The Board of Education*, Civil Action No. 5635. Altering the status quo, that is, not paying benefits as provided in the original contract, was enjoined. However, the board

was not ordered to enter a new and binding one year dental insurance contract on behalf of the individuals it was bargaining with since this would force payment of benefits above the levels paid under the contract and he considered this not maintaining the status quo.

What is really at issue when discussing unfair labor practices is whether the action of the Board in paying the increased insurance premiums or cancelling them should be enjoined. In either case, they represent unilateral action by the Board which might be interpreted as undermining the position of the union as the collective bargaining representative of the school teachers. Yet, the Association does not complain about the payment of the increased premiums. It merely wants this Court to force the Board to continue paying the increased premium. In contrast to *N.L.R.B. v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230, where the employer unilaterally increased the benefits while they were a subject for negotiation, and in *Milford Educational Association v. Board of Education,* 811 Civil Action 1976, where the employer unilaterally increased salary while that was under negotiation, the payment of increased benefits in this case is not being termed an unfair labor practice. It is the possibility of nonpayment of the increased premiums of which the Association complains. In this regard, the Court is concerned whether action by the Court would do more injustice to the collective bargaining process than would be effected if the Association members had to pay somewhere between $2.26 and $5.60 per month.

Looking objectively at Plaintiff's requests for relief, it is apparent that it wants this Court to effectively hamstring the Board on the issue of increased Blue Cross and Blue Shield premiums and, for all intents and purposes, lessen the Board's bargaining equality with the Association at the negotiating table. What the Association wants is a Court mandate that would bolster their contested interpretation of a contract clause that is presently under negotiation.

If the federal standards require an objective analysis of the facts to determine whether the collective bargaining process has been diminished, then, in this case, the Board's letter which drew attention to the possibility that negotiations on the contested issue might fail and they would have to pay increased premiums is nothing more than stating what was then part of the negotiating process. The letter did not say the payments would not be continued by the Board. It said they may not continue. All the while, the Board and the Association continued their collective bargaining. If the Board continues negotiations and the payments, Plaintiff will want no injunctive relief. If the Board discontinues the payment and this Court then has jurisdiction of the case, it will look closely at the question of whether the collective bargaining process has been undermined. But until something does happen, this Court is not prepared to speculate or to issue orders based on speculation as to whether the facts constitute an unfair labor practice for which preliminary injunctive relief is warranted.

In this respect, differences between the cases cited by Plaintiff, primarily *N.L.R.B. v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230, and this case are dramatically different. In *Katz,* the plaintiff sought successfully to have the defendant cease and desist his unfair labor practice. At this preliminary procedural stage, the Plaintiff in this case would have the Court not just order the Defendant to stop writing to the Association members but to resolve the substantive issues which are part of the ongoing negotiations. In weighing the equities, as previously noted, the relief sought is unwarranted.

■ The 1982–1983 increase may not be a new and separate contract like the dental insurance in *Caesar Rodney Education Asso. v. The Board of Education,* Civil Action No. 5635, but this Court is not prepared to say that the increase is within the status quo and thereby interpret the contract in Plaintiff's favor. What is clear, without addressing contract terms, is that continued payment by the Board due to an injunction

from this Court would burden the Board by hamstringing its negotiating position. Also, it is clear that the existing level of benefits is in serious dispute. In both these ways and in the applicability of the "good faith" standard of *N.L.R.B. v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230, this case differs from *Caesar Rodney Education Asso. v. The Board of Education, Id.,* and the injunction issued there. Without a clear demonstration of irreparable injury and in light of the injury the defense would suffer by granting the injunction, an injunction by the Court would be meddlesome and unwarranted. "The Court does not act to interfere in the collective bargaining process on one side or the other." *State v. Delaware State Educational Association,* 326 A.2d at 876.

The second standard for a preliminary injunction is the probability of Plaintiff's ultimate success on the merits. As previously noted by this Court, injunctive relief is not granted on an "either/or" basis, that is, granted either because irreparable injury will occur or because there is a probability of final success. *Bayard v. Martin,* 101 A.2d at 334. Both requirements must be satisfied. Plaintiff has not demonstrated imminent injury let alone irreparable injury for which relief should be granted. When one element of the injunctive criteria is so overwhelmingly resolved against the moving party, a discussion of the probability of success on the merits is not useful and, in fact, appears to be no less than an "advisory opinion" which could well be as satisfactory to the Plaintiff as the issuance of the injunction itself. *FMC Corporation and FMC Acquisition Corporation v. R.D. Scherer Corporation, et al,* Civil Action No. 6889 (Unreported decision of this Court dated August 6, 1982). Consequently any comment by the Court on the likelihood of success could amount to a construction of the underlying contract. As this juncture, such comment would appear unwarranted. *Cf. Bayard v. Martin,* 101 A.2d at 333.

Finally, if there is an adequate remedy existing at law, it is at best unlikely that this Court has jurisdiction over this matter. This is not based on the Board's argument that mandamus is sufficient under *Capital Educators Association v. Camper,* 320 A.2d 782, because the current case does not simply involve bringing the employer to the bargaining table but construing the rights and duties of both parties once there. However, this Court possesses jurisdiction only if the available legal remedy does not offer complete relief. *Pomeroy's Equity Jurisprudence,* 5th Ed., § 139. Jurisdiction over the subject matter of a complaint is to be determined by an examination of the allegation in the complaint viewed in light of what the Plaintiff actually seeks and not necessarily what is pleaded. *Hughes Tool Co. v. Fawcett Publications, Inc.,* Del.Supr., 315 A.2d 577, 579 (1974); *Chateau Apartments Co. v. City of Wilmington,* Del.Supr., 391 A.2d 205, 207 (1978). Viewed realistically, that is, considering the complaint as a whole and from that examination determining just what relief Plaintiff wants by this law suit, the only conclusion this Court can reach is the Plaintiff wants the Court to enforce its interpretation of the contract. Such action by this Court is currently inappropriate without there being any underlying equitable basis properly placing the entire matter in equity. Finally, Plaintiff's counsel's oblique reference in oral argument to specific performance as a possible grounds for jurisdiction was not only an untimely reference to a matter on which neither the Court and opposing counsel have the benefit of a full briefing, it is incorrect. Specific performance is grounds for jurisdiction only when damages are an incomplete remedy. *Pomeroy's Equity Jurisprudence,* 5th Ed. §§ 1401–1402; *Cf. Hughes Tool Company v. Fawcett Publications, Inc.,* 315 A.2d at 519.

Plaintiff has failed to satisfy the requirements for granting a preliminary injunction. For the numerous reasons outlined above, the preliminary injunction must be denied.

IT IS SO ORDERED.