**AMCAR DIVISION, ACF Industries, Incorporated, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Brotherhood of Railway Carmen of the United States and Canada, Lodge 365, AFL–CIO–CLC, Intervenor-Respondent.

No. 78–1386.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 12, 1979.

Decided March 29, 1979.

Rehearing Denied May 15, 1979.

Rehearing and Rehearing En Banc Denied June 11, 1979.

John E. Jay, of Parker, Chapin, Flattau & Klimpl, New York City, for petitioner, AMCAR Division; Johnna G. Torsone, New York City, on briefs.

Andrew Tranovich, Atty., Appellate Section, N.L.R.B., Washington, D.C., for respondent, N.L.R.B.; John H. Ferguson, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., on brief.

Charles A. Werner, of Schuchat, Cook & Werner, St. Louis, Mo., for intervenor-respondent.

Before HEANEY and McMILLIAN, Circuit Judges, and SCHATZ,* District Judge.

HEANEY, Circuit Judge.

This matter is before the Court upon the petition of AMCAR Division, ACF Industries, Incorporated, for review of an order of the National Labor Relations Board and the cross-application of the Board for the enforcement of the order.[1]   The Board

---

* ALBERT G. SCHATZ, United States District Judge, for the District of Nebraska, sitting by designation.

1. The intervening unions are the collective bargaining representatives of the affected employees.

found that AMCAR had violated § 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5), by letting ten contracts for bargaining unit maintenance work without first bargaining with the intervening unions and by failing to provide the unions with a detailed list of maintenance contracts for a two-year period. The Board ordered AMCAR to make the employees whole for the bargaining unit maintenance work contracted out, to bargain with the unions with respect to bargaining unit work contracted out in the future, to promptly furnish the unions a detailed list of all such contracts let, together with the number of man-hours involved in each contract, for the period July 20, 1974, through July 20, 1976, and to post appropriate notices. The Board's decision and order is reported at 234 NLRB No. 158, 98 L.R.R.M. 1287 (1978).[2] We modify the Board's order and, as modified, enforce it.

AMCAR manufactures railroad rolling stock and related items at a large plant in St. Louis, Missouri. It employs skilled tradesmen to maintain its premises. The intervening unions represent these employees as part of an overall production and maintenance union. The collective bargaining agreement in effect when the disputes involved in this proceeding occurred did not contain an explicit reference to contracting out of maintenance work. The agreement defines the bargaining unit to include maintenance employees at the plant, including welders, cutters, burners and electricians.

It does not otherwise define the work to be done by the maintenance employees. The agreement contains a narrow management rights clause.[3]

AMCAR has frequently used independent contractors to make some capital improvements and to perform some maintenance work. It usually informed the unions that it intended to do so and sometimes bargained with them concerning its decision.

From January 1, 1976, through July 12, 1976, AMCAR let fifty-six contracts for maintenance projects in the plant. It failed to notify the unions of some of the contracts or to afford the unions an opportunity to bargain over all of the decisions to let them. In July, 1976, the union protested the letting of some of the contracts and asked AMCAR to furnish it with a list of all maintenance contracts let during the preceding twenty-four months. AMCAR contended that it had a right to let the maintenance contracts and refused to furnish the list requested. It did agree to furnish a list of all maintenance work contracted out for the preceding six months.

On September 3, 1976, the unions filed an unfair labor practice charge with the Board. They charged that AMCAR had violated § 8(a)(1) and (5) of the Act by failing to notify the unions of and refusing to bargain with them about the contracting out of ten maintenance projects,[4] and by refusing to furnish the unions with a complete list of all maintenance work contracted out in the

---

**2.** On February 6, 1979, we enforced an order of the Board which found that AMCAR had violated the Act by contracting out the manufacture of trailer hitches previously manufactured in the plant without negotiating with the unions. *AMCAR Division, ACF Industries, Incorporated v. National Labor Relations Board, et al.,* 592 F.2d 422 (8th Cir., 1979) (*AMCAR I*).

**3.** ARTICLE III—MANAGEMENT RECOGNITION

Section 1. Subject to the provisions of this Agreement, the Management of the Plant, the setting of quality standards, the right to determine the products to be manufactured, the schedules of production, the methods, processes and means of manufacturing, the sources of materials and supplies, the disposition of products, the direction of the working

forces, including the right to hire, promote, suspend or demote, discipline or discharge for proper cause, or transfer, and the right to relieve employees from duty because of lack of work or for other legitimate reasons is vested exclusively in the Company. The Company will not, however, use the provisions of this rule for the purpose of discrimination against any member of the Union because of such membership.

**4.** No complaint was issued with respect to thirty-two of the contracts. A complaint was issued as to fourteen additional contracts but it was dismissed by the Administrative Law Judge. The dismissals were granted because the work in question was of a type that had not been done by unit employees in the past. The dismissals were affirmed by the Board.

preceding two years, together with the number of man-hours involved with each contract. A complaint generally consistent with the charges was issued by the Board on March 15, 1977.[5]

The Administrative Law Judge heard the matter in April, 1977, and on July 29, 1977, issued an order finding that AMCAR had violated § 8(a)(1) and (5) of the Act by unilaterally contracting out four[6] of the ten maintenance projects without giving the unions adequate prior notice of its intentions and without affording them an opportunity to bargain collectively with respect to such work. He further found that AMCAR had engaged in unfair labor practices within the meaning of § 8(a)(5) by refusing to furnish the unions with information as to the number of man-hours involved in each contract on the six-month list. He recommended that AMCAR be required (1) to make whole its employees for any loss of earnings they suffered by reason of its unlawful conduct, together with interest at the rate of six percent per annum, (2) to cease and desist from contracting out bargaining unit work without giving the unions notice and an opportunity to bargain with respect thereto, and (3) to furnish the unions with a list of the maintenance contracts with the man-hours involved in each contract for the six-month period prior to the filing of the charge and (4) to post appropriate notices.

On February 27, 1978, the Board modified the findings of the Administrative Law Judge by holding that the six remaining contracts[7] were also violative of the Act and by extending the period for which AMCAR was required to furnish a list of maintenance contracts from six months to two years. It adopted the order of the Administrative Law Judge as modified.

AMCAR asks us not to enforce the Board's order. It contends that its decisions to contract the maintenance work were not mandatory bargaining subjects under § 8(a)(5). It also contends that it is unreasonable to require the requested list for a two-year period and to advise the unions before it contracts for any maintenance work. It argues, alternatively, that the union had prior notice of the contracts at issue and waived its right to bargain with respect to them, and that § 10(b) barred the issuance of the complaint as to some contracts.

The United States Supreme Court, in *Fibreboard Paper Products Corp. v. N.L.R.B.*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), held that

> the "contracting out" of the work previously performed by members of an existing bargaining unit is a subject about which the National Labor Relations Act requires employers and the representatives of their employees to bargain collectively.

*Id.* at 209, 85 S.Ct. at 402.

Mr. Justice Stewart, joined by Justices Douglas and Harlan, concurred noting that the decision was limited to situations where employees in an existing bargaining unit were replaced by an independent contractor doing the same work under similar conditions of employment. *See also N.L.R.B. v. King Radio Corporation*, 416 F.2d 569, 571 (10th Cir. 1969), *cert. denied*, 397 U.S. 1007, 90 S.Ct. 1234, 25 L.Ed.2d 420 (1970); *Puerto Rico Telephone Company v. N.L.R.B.*, 359 F.2d 983 (1st Cir. 1966); *District 50, United*

---

5. The complaint also alleged that AMCAR had violated the Act by contracting out bargaining unit production work. The Board held that AMCAR had violated the Act by so doing. AMCAR sought review of this order but indicated, at oral argument, that the issue was controlled by our opinion in *AMCAR I, supra.* We accept this concession and enforce the Board's order with respect to such contracts.

6. The contracts involved: (1) the rebuilding of two "Erie Presses," (2) the installation of hydraulic controls for a "N/C Multiple Punch,"

(3) the replacement of valves and six-inch water main, and (4) the installation of grease lines on the east transfer table in Building 266.

7. The contracts involved: (1) the rebuilding of "Punch No. 7111," (2) the rebuilding of "Machine 7124," (3) the rebuilding of "Burning Machine 5901," (4) the replacement and repair of a leaking sewage system in Building 3, (5) the furnishing and installing of a new guard house and (6) the opening of plugged sewers in the parking lot.

*Mine Workers Local 13942 v. N.L.R.B.*, 358 F.2d 234 (4th Cir. 1966).

█ The National Labor Relations Board in *Westinghouse Electric Corp.*, 150 N.L. R.B. 1574, 58 L.R.R.M. 1257 (1965), specifically set forth the factors it follows in determining whether an employer has a duty to bargain about decisions to contract out maintenance work. The Board stated:

> [W]here the Board has found unilateral contracting out of unit work to be violative of Section 8(a)(5) and (1), it has invariably appeared that the contracting out involves a departure from previously established operating practices, effected [sic] a change in conditions of employment, or resulted [sic] in a significant impairment of job tenure, employment security, or reasonably anticipated work opportunities for those in the bargaining unit.

58 L.R.R.M. at 1258 (footnote omitted). In our view, the *Westinghouse* "guidelines" substantially comport with *Fibreboard* and fairly set forth the factors which should be considered in determining whether an employer has violated the Act by contracting out of work.

Applying *Westinghouse* to the facts of this case, we find that there is substantial evidence in the record as a whole to support the Board's finding that AMCAR violated § 8(a)(5) of the Act by contracting out the (1) rebuilding of Erie Presses 7053 and 7054, (2) installation of hydraulic controls for the N/C Multiple Punch, (3) installation of new grease lines on the east transfer table in Building 266, and (4) installation of a new guard house. There is no substantial evidence to support a violation based on the plumbing contracts, and § 10(b) of the Act barred the issuance of a complaint with respect to the rebuilding of Machine 7124, Burning Machine 5901 and Punch No. 7111.

### The Erie Presses

█ With respect to the Erie Presses, AMCAR argues that it was engaged in their complete, complex rebuilding. It maintains that its employees lacked the skills necessary to do the work, that there were insufficient unit employees to complete the job within a reasonable period of time, and that the job was scheduled for completion during the annual two-week shutdown period when so much other maintenance work existed that unit employees were not available to undertake the rebuilding.

Substantial evidence in the record as a whole supports the Board's finding that unit employees had performed, from time to time, all of the separate elements of the job required to rebuild the presses and that the contracting out created a significant impairment of reasonably anticipated work opportunities for those in the bargaining unit. On June 15, 1976, the date the contract was let to rebuild the Erie Presses, twenty qualified, maintenance employees were on layoff status. Thirteen of these remained on layoff status during the period that the work was being performed. There may be merit to AMCAR's argument that even if the laid off employees had been used, the job could not have been completed as quickly, conveniently and inexpensively as AMCAR desired. But these arguments cannot be used to defeat the employees' right to notice and an opportunity to bargain if, in fact, the employees are adversely affected by the decision to contract the work out. *N.L.R.B. v. Jackson Farmers, Inc.*, 457 F.2d 516 (10th Cir. 1972); *International Union, U.A., A. & A. Imp. Wkrs. v. N.L.R.B.*, 127 U.S.App.D.C. 97, 381 F.2d 265 cert. denied, 389 U.S. 857, 88 S.Ct. 82, 19 L.Ed.2d 122 (1967). With respect to the contracting out, the Act requires

> that the issue be submitted to the mediatory influence of collective negotiations. * * * "[I]t is not necessary that it be likely or probable that the union will yield or supply a feasible solution but rather that the union be afforded an opportunity to meet management's legitimate complaints * * *."

*Fibreboard Paper Products Corp. v. N.L. R.B., supra* at 214, 85 S.Ct. at 405.

### The N/C Multiple Punch

█ Substantial evidence supports the Board's conclusion that AMCAR violated

§ 8(a)(5) by failing to negotiate with respect to the installation of controls on the N/C Multiple Punch. The evidence shows that the maintenance employees had installed the controls in a similar machine when it had been installed at an earlier date. While no maintenance union employees capable of performing the work were on layoff when the work was contracted out, several were laid off during the period when the work was in progress. The work began on March 29, 1976, and completed on October 27, 1976. Three men were laid off in May and were not recalled until September or October. Six were laid off in June and were not recalled until September; and four more were laid off in July and were not recalled until August. The Board could reasonably infer from these facts that the subcontracting resulted in a loss of reasonably expected work opportunities for men in the bargaining unit.

### The Installation of Grease Lines on the East Transfer Table

■ Substantial evidence also supports the Board's finding that AMCAR violated § 8(a)(5) of the Act by failing to bargain with the unions with respect to the installation of grease lines on the east transfer table in Building 266. Maintenance unit employees, particularly machinists and pipefitters, had previously installed a similar grease line. Thirteen employees, who were qualified to work on the installation, were on layoff status when the work was being done.

### The New Guard House

■ Substantial evidence supports the Board's finding that AMCAR violated § 8(a)(5) by failing to negotiate with respect to installation of a new guard house. Carpenters had done similar work in the past. Two carpenters, as a result of a layoff, were on transfer status when the contract was let and during most of the period when the job was being performed.

### Plumbing Contracts

■ Substantial evidence does not support the Board's finding that AMCAR violated § 8(a)(5) by failing to negotiate with respect to the contracting out of three plumbing jobs. In our view, the Board failed to prove adverse impact on the bargaining unit.[8]

■ The first contract involved the replacement of valves, a six-inch water main and a valve pit in the north yard of the plant. There is no evidence in the record indicating how many employees the contractor used to complete the work in this short period. The record does show that no pipefitters were unemployed on June 1, 1976, when the contract was let and that none were unemployed when the work began on June 3, 1976. One employee was laid off on June 7 and continued on that status until August 21, 1976, but the work was completed on June 13, 1976. The Board has failed to establish that the contracting out affected a change in conditions of employment or resulted in any significant impairment of job tenure, employment security or reasonably anticipated work opportunities for those in the bargaining unit.

The second plumbing contract was for the replacement and repair of the leaking sewage system in Building No. 3. This contract

---

8. We find no merit to the Board's argument that AMCAR cannot raise "the adverse impact" issue because it failed to file exceptions to the Administrative Law Judge's decision, failed to challenge his findings on the grounds that the General Counsel's evidence was insufficient to establish adverse impact and failed to file cross-exceptions to the Administrative Law Judge's failure to find adverse impact. The issue was implicitly raised at every step of the proceeding and is, thus, properly before us, see N.L.R.B. v. Annapolis Emergency Hospital Ass'n, 561 F.2d 524 (4th Cir. 1977); National Labor Relations Board v. Spiewak, 179 F.2d 695 (3d Cir. 1949). Moreover, because AMCAR won on this issue on the three contracts in question before the Administrative Law Judge, it had no cause to urge the point before the Board and it may properly raise the issue before this Court. See Barton Brands, Ltd. v. N.L.R.B., 529 F.2d 793 (7th Cir. 1976); N.L.R.B. v. Good Food Mfg. & P. Corp., Chicago Lamb P., Inc., 492 F.2d 1302 (7th Cir. 1974); N.L.R.B. v. Local 282, International Brotherhood of Teamsters, 412 F.2d 334 (2d Cir. 1969), cert. denied, 396 U.S. 1038, 90 S.Ct. 682, 24 L.Ed.2d 682 (1970).

was let on June 3, 1976, and completed three days later. No pipefitters were unemployed at the time that this work was done and there was no adverse impact on bargaining unit employees.

The third contract was for the opening of a plugged sewer in a badly flooded parking lot. This contract was let on June 29, 1976, and completed on the same day. Unit employees had unplugged sewers in the past and had tried to unplug this one. They were unable to do so with the equipment owned by AMCAR. Under these circumstances, there certainly was no requirement that the company purchase or rent special equipment simply to provide one employee on layoff a few hours of work. The adverse impact, if any, was insignificant.

### The Rebuilding of Punch No. 7111, Machine 7124 and Burning Machine 5901

The Administrative Law Judge dismissed the complaint with respect to Punch No. 7111, Machine 7124 and Burning Machine 5901 because charges with respect to these machines were not filed in accordance with § 10(b) of the Act which requires filing within six months of the date that the unions had knowledge of the violation. Work on the machines commenced more than six months before the charges were filed. The Administrative Law Judge stated:

"You do not tear down * * * a machine the size of those involved herein without employees being fully aware of it, especially maintenance employees." Not only the employees themselves but the shop stewards would have had to have been particularly inattentive to have failed to observe the rebuilding of [these] machines * * *. The knowledge of the employees in the affected departments and, in particular, the knowledge of the shop stewards are attributed to the Unions. Thus the Unions had both actual and constructive knowledge more than 6 months before the filing of the charges herein that outside contractors were rebuilding the machines * * *.

The Board disagreed with these factual findings, stating:

The record shows that the plant is extremely large and that there are many employees working there so that an employee or a steward would not necessarily be alerted to the possibility of unlawful subcontracting if he observed unknown persons repairing the machinery. But even if the circumstances had been such that it was more likely that the employees would have known that nonemployees were doing their work, that evidence would not be a sufficient basis for inferring that the Charging Party had notice of unlawful subcontracting. For where, as here, the rights of parties to use our processes are at stake, we have long applied a more stringent test for determining when a party has notice of a possible infringement of its rights.

Thus, in *L. C. Cassidy & Sons, Inc.*, 185 NLRB 920, 926 (1970), we adopted the Administrative Law Judge's finding that notice—whether actual or constructive—must be clear and unequivocal. And, we note that, since Section 10(b) is a defense, the burden is on Respondent to establish notice. *Alabaster Lime Company, Inc.*, 194 NLRB 1116, 1118 (1972). Accordingly, we find that simply because the machines are large and there was no evidence that Respondent acted to conceal these three subcontracting projects from the Unions does not establish that the Unions had notice on the date the work commenced. Here, the record shows that the Unions did not receive actual notice until on or about December 6, 1976, when Respondent provided them with a list of subcontracts, which included [the machines in question]. We, therefore, find that the allegations concerning [these machines] were not barred by Section 10(b). [Footnotes omitted.]

■ We agree with the Board that since § 10(b) is a defense, AMCAR has the burden to establish that the unions had actual or constructive notice of the fact that it was contracting out bargaining unit maintenance work. We do not agree, however, that its burden is more rigorous than for any other defense. AMCAR simply must establish the defense by a fair preponderance of the evidence.

■ However, under either standard, there is no substantial evidence to support the Board's finding with respect to notice.[9] Rather, the evidence supports the Administrative Law Judge's finding that the union had actual and constructive knowledge of the fact that nonbargaining unit employees were rebuilding the three machines in question more than six months before the filing of the charges herein.

In addition to the reasons given by the Administrative Law Judge for his finding, the record shows that AMCAR told union representatives in 1975 that it intended to rebuild several machines in the plant and that it intended to use independent contractors to do much of the work. Moreover, union agents and stewards working in the plant as maintenance men had an opportunity to observe work being done on the machinery. For example, Herbert Goodrick, the business agent of the Brotherhood of Railway Carmen, was an eight-year employee of AMCAR. After he left AMCAR to become business agent of the union, he spent considerable time in the plant and had opportunities to observe work being done in the plant. Robert Bannister, the chief steward for the machinists' union, was a seventeen-year employee of the company. He was intimately acquainted with the machinery used in the plant and presumably with the maintenance employees who regularly worked on that machinery. His work record took him into every area of the plant.

It is true that the plant was large and employed hundreds of people, but the maintenance employees represented only a fraction of the total. There is nothing in the record to support the Board's inference that the maintenance employees and their representatives would not have known that non-employees were doing work customarily done by them.

### The Remedy

AMCAR contends that the Board erred in requiring it to furnish the unions with a complete list of all maintenance subcontracts let for the period July 20, 1974, through July 20, 1976, to contract out any bargaining unit work without first giving notice to the unions and affording them an opportunity to bargain with respect to them, and to furnish the unions relevant information concerning any contracting out of work which can be performed by unit employees.

It initially argues that it was unreasonable for the Board to require it to give notice of all work contracted out during the twenty-four-month period and to state the number of man-hours involved in each contract. AMCAR states that because a strike occurred during this period, their records are not precise and that because the records are scattered between the plant and the headquarters, the amount of time and effort it would take to compile the hours worked on each job would be prohibitive. They finally urge that the number of man-hours cannot be provided because it does not exist in any accurate form.

■ "There can be no question of the general obligation of an employer to provide information that is needed by the bargaining representative for the proper performance of its duties." *NLRB v. Acme Industrial Co.,* 385 U.S. 432, 435–436, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967); *N.L.R.B. v. Truitt Mfg. Co.,* 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956). It is for the Board to determine whether the information is reasonably necessary to the union's role as bargaining agent in the administration of a collective bargaining agreement, and we will not interfere with that determination unless it appears to be arbitrary or unless the requirements are unduly burdensome. *See Western Massachusetts Elec. Co. v. N.L.R.B.,* 573 F.2d 101 (1st Cir. 1978); *N.L.R.B. v. Rockwell-Standard Corp., Trans. & Axle Div.,* 410 F.2d 953 (6th Cir. 1969); *N.L.R.B. v. Goodyear Aerospace Corporation,* 388 F.2d 673 (6th Cir. 1968);

---

9. Were it not for the § 10(b) issue, the result with respect to these machines would be the same as for the Erie Presses.

*Curtiss-Wright Corp., Wright Aero. Div. v. N.L.R.B.*, 347 F.2d 61 (3rd Cir. 1965). The Board now concedes that its order requires the company only to provide the number of man-hours involved in each subcontract "arguably involving bargaining unit work." With this concession, the Board's order is clearly neither arbitrary nor unduly burdensome.

AMCAR's objections to notifying the union with respect to bargaining unit work that it intends to contract out in the future must fail for the reasons previously stated. AMCAR's objection to negotiating with respect to such work must also be rejected. We note, however, that the negotiations need not be as formal or as extensive as are negotiations for a new contract. In so holding, we approve the Board's language in *Shell Oil Co.*, 149 NLRB No. 26, 57 L.R.R.M. 1279, 1280 (1964):

> [W]e are mindful that the permissibility of unilateral subcontracting will be determined by a consideration of the setting of each case. Thus, the amount of time and discussion required to satisfy the statutory obligation 'to meet at reasonable times and confer in good faith' may vary with the character of the subcontracting, the impact on employees, and the exigencies of the particular business situation involved.

*See District 50, United Mine Workers, Local 13942 v. N.L.R.B., supra.*

The Board's order will be enforced, as modified. Each party to the appeal will bear its own costs.