*728 OPINION OF THE COURT
Jeffrey M. Atlas, J.
During the summer of 1986, three unions, representing a variety of city employees, filed petitions before the Board of Collective Bargaining, claiming that the city, by unilaterally promulgating certain regulations governing hiring or promotion of employees had committed an improper labor practice under the Administrative Code of the City of New York. After consideration of the matter the Board, the respondent herein, ruled that the city had acted improperly by not submitting its new regulations to collective bargaining. The petitioner has asked me to set aside that determination. For the reasons given herein, the instant petition is granted.
In April 1986, the petitioner promulgated Personnel Policy and Procedure Bulletin number 401-86 (hereafter P.P.P. 401-86) entitled "Debt Collection From City Employees of Debts Owed to the City through Payroll Deduction”. This regulation required that, for appointment or promotion, all
"newly hired or promoted employees must disclose all existing debts to the City of New York and must consent to the payment of these debts through a lump sum or payroll deductions.
"If an employee selected for appointment or promotion on or after February 3, 1986 refuses to comply with the following procedures, then such person shall not be appointed or promoted, or if appointed or promoted, shall be dismissed or demoted.”
P.P.P. 401-86 went on to require that all individuals selected for appointment, promotion, or reinstatement after a break in service, complete and execute a form, designated as form DP-2379A and entitled "Questionnaire and Agreement Form”. This questionnaire called for all covered employees to disclose all debts owed by him or her to the city, whether as the result of fines, penalties, judgments or overpayment of public assistance. Such employees were also required to disclose whether or not he or she had filed a New York State/City income tax return for the previous five years and, if not, each was called upon for an explanation. In addition, each individual was required to provide all home addresses for the prior 10 years and registration information respecting vehicles owned by the employee for a period in the past. Finally, the questionnaire, which was to be affirmed by the applicant as true under the penalty of perjury, included an authorization releasing to the *729 City Department of Investigation information verifying the timely filing of relevant local income tax returns, a warning that false statements or willful omissions would result in disqualification from or termination of employment and a repayment agreement providing that: "As a qualification for appointment and continued employment with the City, I agree to repay any amounts which I owe to the City * * * either by lump sum payment or, if I am able to demonstrate hardship, by deductions from my paycheck not to exceed 10% of the net income indicated on my paycheck. I further agree to cooperate with officials of the City * * * in determining the amount which I may owe to the City. Failure to repay any amounts which I owe the City * * * may be grounds for disciplinary action.” Under the city’s regulations the questionnaire was to be kept on file with the city’s Department of Investigation, a copy of the form was to be given to the hiring agency and information regarding disclosed debts was to be transmitted to the agency to whom the debt was owed. Under the regulation, employees seeking to dispute the debt could do so before the agency to whom the debt was owed. Failure of the employee and agency to reach agreement with regard to the disputed debt would result in a review by the Department of Investigation which would be empowered to make a determination either to qualify or disqualify the employee for appointment or promotion. Finally, it was provided, an adverse ruling could be appealed by the employee to the New York City Civil Service Commission whose orders are further subject to review by the court by way of a CPLR article 78 proceeding.
Within several months of the promulgation of P.P.P. 401-86 petitions were filed with the respondent alleging that the city, by the issuance of these requirements, had unilaterally changed the terms and conditions of employment of the employees represented by the petitioning unions. The unions contended that alterations in the terms or conditions of employment must, under section 1173-4.3 (a) of the Administrative Code of the City of New York (now § 12-307 [a]), be made the subject of collective bargaining between the city and authorized representatives of its employees and that the city’s failure to honor that mandate constituted an improper labor practice. The city disputed this claim before the respondent Board and argued that its edicts constituted no more than the fixing of standards or qualifications for employment exempt, as a managerial prerogative, from the scope of mandatory collective bargaining and that in any event, the rules did not *730 constitute an alteration in the terms or conditions of city employment. In general, the respondent ruled that the declaration within P.P.P. 401-86 did not constitute the fixing of qualifications of employment and was not therefore exempt from mandatory collective bargaining. Moreover, the respondent ruled that the policy and its accompanying questionnaire so intruded into the privacy rights of candidates for promotion as to constitute an alteration in the terms and conditions of employment of those employees. As to those employees it held the city’s action to be an unfair labor practice, though it did not so hold as to new candidates for employment who, the respondent believed, were not so vitally affected.
Proper review of the respondent’s rulings begins with the understanding that while the governing language of the Administrative Code of the City of New York differs somewhat from the New York State Fair Employment Act (the Taylor Law) and its model, the National Labor Relations Act, all three laws have, in many essential respects, been interpreted in the same way.[1] Agencies and courts administering these acts have often borrowed from each other evolving notions of the sensible application of these rules and, indeed, the city act was intended to be substantially equivalent to the State act *731 administered by the Public Employment Relations Board (hereafter PERB) (see, Civil Service Law § 212).
Significantly, all these acts are premised upon the very basic notion that business decisions directed at the terms and conditions of employment must be the subject of collective bargaining with the duly constituted representative of its employees. While the expression "terms and conditions” of employment most certainly includes matters pertaining to wages, hours and working conditions, in some circumstances the meaning of the phrase is clouded and we have come to understand that "no litmus paper test can be devised to automatically identify a 'term and condition of employment’.” (Matter of Association of Cent. Off. Adm’rs [Board of Educ.], 4 PERB ¶ 4509, at 4599.) As a general principle the phrase covers subjects which have a significant or material relationship to conditions of employment (see, Fibreboard Corp. v Labor Bd., 379 US 203 [1964]; Matter of Association of Cent. Off. Adm’rs [Board of Educ.], supra) or, put differently, it includes matters directly affecting only the employer and employee relationship (see, Matter of West Irondequoit Teachers Assn. v Helsby, 35 NY2d 46, 51 [1974]). On the other hand, fundamental decisions of management made in pursuit of its essential goals or mission, or other managerial decisions which impinge only indirectly or tangentially upon the employment condition, will generally be treated as exempt from mandatory collective bargaining. (See, Fibreboard Corp. v Labor Bd., supra; Matter of West Irondequoit Teachers Assn. v Helsby, supra; Matter of City School Dist. v Helsby, 42 AD2d 262 [3d Dept 1973].) Finally, while these general rules suffice to determine the need for collective bargaining between employees and employers in the private sector (see, e.g., Newspaper Guild v National Labor Relations Bd., 636 F2d 550 [DC Cir 1980]) it is certain that management’s right to make fundamental policy decisions regarding the operation and goals of its mission is, if anything, more compelling in the public sector where the employer, charged with the management and direction of a governmental enterprise, has the added responsibility of fulfilling a public trust (Matter of Association of Cent. Off. Adm’rs [Board of Educ.] supra; Matter of City School Dist. [New Rochelle Fedn.], 4 PERB ¶ 3060).
Needless to say, these rules, like so many intended to guide us through complex human endeavors, are considerably more difficult to apply than to state. Such difficulties in application *732 thus can be found where, for example, the basic business decisions of management, ordinarily an exempt prerogative, directly alter employment conditions, or where changes in the basic ways that management does business have a more remote impact on the employer-employee relationship. In such instances, however, it seems settled that if the announced policy of management expresses some vital fundamental goal essential to management’s mission, that policy may not be abridged against the will of management by compelled collective bargaining; nor may less grave decisions which bear only tangentially upon the relationship of employer and employee. (See, Fibreboard Corp. v Labor Bd., supra; Newspaper Guild v National Labor Relations Bd., supra; Matter of Association of Cent. Off. Adm’rs [Board of Educ.], supra; Matter of Herdle [West Irondequoit Teachers Assn.], 4 PERB ¶ 3070.) Often, however, a seemingly fundamental change in management policy is not so clearly an unfettered management prerogative. In such cases, while the thrust of the policy is to effect changes apparently necessary to make better or more efficient the pursuit of management’s mission, the policy is somewhat less than vital while the effect of it upon the working conditions of the employees is clearly discernable and direct rather than tangential. In such cases, the difficult determination as to whether the employer’s policy should or should not be relegated to the bargaining table as a term or condition of employment has been based upon a balancing of the interests involved. (See, Newspaper Guild v National Labor Relations Bd., supra; Matter of Board of Educ. [Council of Supervisors & Adm’rs], 19 PERB ¶ 3015; Matter of City School Dist. [New Rochelle Fedn.], supra.) This test (said to have evolved from the concurrence of Justice Stewart in Fibreboard Corp. v Labor Bd., supra) seeks to assist the adjudicative body to determine if the real thrust of the management decision in question is the pursuit of basic mission of the enterprise or if the decision, written as if to pursue such goals, is really about conditions of employment. (See, Newspaper Guild v National Labor Relations Bd., supra.)
Finally, as an additional predicate for any further discussion of the matter, it must be noted that the determination as to whether management’s decision is exempt from collective bargaining or not, is one that must, in these circumstances, be made by the Board of Collective Bargaining in a critical and objective manner and upon a particularized analysis. (See, Newspaper Guild v National Labor Relations Bd., supra.) *733 Notwithstanding its presumed expertise in this area, if the Board’s decision is irrational, arbitrary, capricious or against the law it must be set aside. If it is supported by reason and law it must be upheld (Matter of Incorporated Vil. of Lynbrook v New York State Pub. Employment Relations Bd., 48 NY2d 398, 404 [1979]; Matter of West Irondequoit Teachers Assn. v Helsby, supra).
In the instant case there has been much argument over whether or not the edicts of the city in issue express the fundamental goal of the city to state qualifications for employment. To begin with it is generally conceded that the establishment of qualifications for employment or promotion (in the language of the Administrative Code, determination of the "standards of selection for employment”) is ordinarily done by management in fulfillment of its fundamental goals and, as a managerial prerogative, it is a matter exempt from collective bargaining (Matter of Auburn City Unit [City of Auburn], 9 PERB ¶ 3085; Matter of Association of Cent. Off. Adm’rs [Board of Educ.], supra; Matter of Herdle [West Irondequoit Teachers Assn.], 4 PERB ¶ 4511). This must be so for management should have every right to expect that its employees will function in a way that best carries out the essential mission of the employer. Thus, it has been said that a qualification for employment is a precondition, not a condition of employment, defining "a level of achievement or a special status deemed necessary for optimum on-the-job performance” and as such a fundamental policy right of management. (Matter of Association of Cent. Off. Adm’rs [Board of Educ] supra; Matter of Herdle [West Irondequoit Teachers Assn.], 4 PERB ¶ 3070, supra; Matter of Herdle [West Irondequoit Teachers Assn.], 4 PERB ¶ 4511, supra.) This definition, it is clear, serves to maintain that, when management announces a policy fundamental to its business, management alone may decide when and under what circumstances its prospective employees best serve that policy, subject of course to laws properly prohibiting discrimination in employment in a variety of ways.
In argument over this issue the city contends that its directives are exempt from collective bargaining because they constitute the fixing of qualifications or standards of selection for employment. The Board concluded that the mandate of the city as well as the questionnaire implementing that mandate did not constitute "legitimate qualifications for * * * promotion.”
I have concluded, however, that the Board’s determination *734 in this case was unreasonable and, when measured against the precise language and import of the city’s edict, arbitrary and in violation of what the Board understood to be the standard of law governing such declarations made by a public employer.
First, in its decision the Board seems to have overlooked an important argument advanced to it by the city. In its announced policy the city sought to disqualify from promotion not just employees who owed a level of debt to the city but employees who refused to pay debts justly owed to the city. The plain language of this policy statement, as set forth in P.P.P. 401-86, makes clear that it is only those who refuse to repay debts to the city that shall be denied employment or promotion. Whether one agrees with the ethical or political wisdom of such a policy, its underlying rationale is fairly evident. There is, as the Board recognized in this case, a substantial and paramount public interest in the prompt and efficient collection of debt owed to the government. There is also, as the city has repeatedly argued, a significant and related governmental interest in seeking to prevent the hiring or promotion of those employees who would deliberately thwart the collection of such necessary revenue. One cannot simply ignore the argument that an employee who deliberately refuses to repay a debt justly owed to his public employer clearly and self-evidently places his own interest above that of the public’s and to that extent lacks the integrity for public service. It is indeed difficult to say that one who would continue to draw a salary paid from public revenue possesses good character when he contemporaneously refuses to contribute his fair share to such revenue. Moreover, the public employees’ refusal to repay debts necessarily undermines the public’s confidence in government, encouraging the citizen to believe that since members of her own government cannot be relied upon to obey the law she need not obey it either. As the city has aptly pointed out, one cannot reasonably expect the city to collect taxes if the tax collector refuses to pay his, nor can one expect a citizen to pay a parking fine if the enforcement agent refuses to pay her own fines.[2]
*735 Without ever acknowledging these arguments the Board did agree that good character may be an appropriate qualification for promotion or employment if determined by some objective standard. It concluded, however, that the city’s declarations were not "intended or used” for the purpose of determining character and reputation in any way relevant to an applicant’s ability to perform a job.
In my view, the Board’s analysis of the city’s edicts is flawed in more than one respect and represents no more than its statement of what it might have preferred under the circumstances as a test of character. First it should be noted that absolutely no analysis appears in the Board’s decision to support the view, made questionable by the ignored arguments of the city, that the policy lacks relevance to an applicant’s ability to perform his or her job in a manner consistent with the goals of government. Moreover, at no point does the Board consider that the edict might have established a status, that is, nonindebtedness to the city, deemed necessary for optimum on-the-job performance. Instead, the Board points out that the city’s policy does not take account of the size, nature or duration of the debt owed by an employee in determining the good character of the individual and notes that the policy does not discriminate between individuals of different debt status. The city’s policy, however, makes the patently valid point that, whatever can be said of a person by the nature or extent of the debts he or she has incurred to the city, the refusal to pay those debts upon demand negatively reflects upon the individual’s character. Nowhere does the Board find that to be an incorrect standard. Rather, the Board by its analysis implies that, in its view a better standard could be employed and that, absent the use of what it considers the better standard, the city’s policy does not represent a "legitimate” qualification for employment. The Board goes on to find fault with the city’s policy by noting that the city does not inquire of debt owed by the employee to creditors other than the city and criticizes the city for not explaining why private debt would have any lesser bearing on character and reputation of the employee. This argument begs the question and seeks to supplant the Board’s concepts of hiring for the city’s. While it may be true that indebtedness to others may bear on the character of a prospective employee, such a fact does not make less true the lack of good character of an employee who refuses to repay a public debt. Finally, the Board argues, as a predicate to its finding, that neither an earlier announcement *736 by the Mayor disclosing this policy nor the statement of policy itself refers in any way to the fact that this policy represents a test of character for future employees. In this respect, the Board concluded that the policy represented no more than a revenue-collecting device employed in the city’s pursuit of its financial interests and not a matter related to its interests in integrity in government. However, the Mayor’s statements do not say nor do they suggest that this policy is not designed or intended to maintain such a standard for public employees. Moreover, such statements, while in pursuit of the paramount policy of collecting revenue for the city, are also inherently consistent with the goal of maintaining the integrity of public employment. Indeed, even if the statements represented convincing proof that the policy was only intended to reach matters related to revenue collecting, the Board, in its decision, more than once agreed that such an effort is clearly in pursuit of a fundamental goal of government and clearly in the public interest. It is hard to believe otherwise. One must question then the wisdom of a decision which acknowledges the importance to government of its ability to efficiently collect revenue justly due from its employees but which relegates a policy in pursuit of that fundamental goal to collective bargaining.
Perhaps it might be argued that even though the city’s directives reach some basic goals of government’s mission, nonetheless these edicts touch significantly upon the interests of city employees in the terms and conditions of their employment and that, by the appropriate balancing test, such policies should be made the subject of collective bargaining. In this respect the city has argued that even if its directives were not to be viewed as standards or. qualifications of employment, nonetheless, they do not represent the fixing of terms or conditions of employment and, therefore, are not the proper subject of mandatory collective bargaining. Again the Board disagreed with the city. In my view a significant flaw exists in the reasoning of the Board in this respect as well.
As to employees who are or may become applicants for promotion the Board held that the required completion of the debt questionnaire imposes an intrusion into employee privacy which outweighs the city’s policy interests and thus constitutes a term or condition of employment. In this finding the Board purported to utilize the balancing tests employed by PERB in Matter of Board of Educ. (Council of Supervisors & Adm’rs) (19 PERB ¶ 3015, supra) by which PERB measured *737 the need to compel collective bargaining of a financial questionnaire utilized by the Board of Education to maintain integrity amongst its staff in the wake of allegations of impropriety by the school’s Chancellor. In that case PERB maintained that on balance the intrusion of the questionnaire into the private lives of the employees involved oútweighed the interests of government in obtaining the information sought in the questionnaire and, on that analysis, felt that the proposed regulations so affected terms and conditions of employment as to require collective bargaining.
As I have already noted a balancing of interests is generally called for in difficult circumstances to determine if collective bargaining is required. At times there may be a real conflict between the employer’s freedom to manage his business in areas involving the basic direction of an enterprise and the right of employees to bargain on subjects which affect the terms and conditions of employment. In such instances, it has been said, a balance must be struck, if possible, which will take account of the relative importance of the proposed actions to the two parties (Newspaper Guild v National Labor Relations Bd., 636 F2d 550, 561-562, supra, a decision which lies at the heart of Matter of Board of Educ. [Council of Supervisors & Adm’rs], supra, since its principles were adopted [unfortunately only in part] in Matter of State of New York [Civil Serv. Employees Assn.], 18 PERB ¶ 3064, and Matter of County of Rensselaer [Rensselaer County Unit], 13 PERB ¶ 3080, earlier PERB decisions upon which Matter of Board of Educ. relied as authority for its approach in this circumstance). This balance does not suggest, however, that the evaluating Board may make an arbitrary choice of what it perceives as the more significant interest. To the contrary, the choice can only be properly made by critical appraisal of the conflicting interests of each side appropriately weighing, for example, whether the regulation would appear to be reasonably related to the core concerns of management without vitally affecting the interests of the employees or whether the regulation of employees interferes substantially with the civil and economic rights of those employees without clearly defined, directly necessary compensating benefits in terms of the employers’ legitimate concerns (Newspaper Guild v National Labor Relations Bd., supra).
Unfortunately this Board, following PERB’s lead set in Matter of Board of Educ. (Council of Supervisors & Adm’rs) (supra), while adopting the broader concept of balancing, *738 ignored the more specific command that such balancing, to avoid being arbitrary, must employ a specific and critical analysis of the interests involved. In its decision it simply concluded that since the city’s interest in efficiency and integrity was outweighed by the employees’ interests in keeping private the information sought by the proposed questionnaires, the matter was not exempt from collective bargaining. What the Board did not do was to precisely appraise whether the proposed regulations were reasonably related to the core concerns of the city, nor did it evaluate the effect upon the vital concerns of the employees involved nor whether such regulation substantially interfered with the civil rights of the employees without clearly defined and directly necessary compensating benefits in terms of the employers’ legitimate concerns. This error is clear at several points in the Board’s decision.
First, this Board, as did PERB in its earlier decision involving a dissimilar questionnaire, adopted the notion that, by public policy, public employees enjoy rights of privacy. Phrased in that unqualified manner, these Boards weighed that purported policy against the public policy that public employers should avoid corruption. Without any reason articulated in either decision, other than the consideration of a third factor, to wit, that public policy establishes the right to collective bargaining of terms and conditions of employment, each Board found that the first outweighed the second. Such an approach, painfully oversimplified and based upon an unfortunately edited statement of principles, could only have led to an arbitrary result. For example, little attention seems to have been paid in either decision to the fact that the public interest in avoiding corruption, or as in this case to obtain repayment of public debt and determine the character of applicants for employment or promotion, is of enormous importance to government in carrying out its core concerns. No attention was paid to the reasonable relationship that such required questionnaires, or particular questions on them, bore to those legitimate concerns. Indeed, even in some similar segments of the private sector, efforts at maintaining integrity have been viewed as of such importance as to overwhelm the rights of employees to collectively bargain some rules (but, not all) designed to assure that integrity (see, e.g., Newspaper Guild v National Labor Relations Bd., supra). All the more so in the public sector, where matters of integrity go well beyond the question of profit or loss. Moreover, it is an unfortunate *739 oversimplification to state, unqualifiedly, that public employees enjoy rights of privacy when the vitality of such rights has been reduced by well-settled law. In fact, lawfully enacted executive orders "designed to eliminate inefficiency and deter official corruption, significant public interests,” do "not infringe upon individual employees’ constitutional rights.” (Evans v Carey, 40 NY2d 1008, 1009 [1976].)[3] Such rights of privacy as public employees enjoy are, like so many rights derived from the Constitution, qualified rights that must and often do give way to greater public concerns. Finally, it should be pointed out that, while the law requires the collective bargaining of terms and conditions of employment, it is equally a matter of public policy that management’s right to make fundamental policy decisions is, if anything, more compelling in the public sector where, as I have earlier noted, the employer has the added responsibility of fulfilling a public trust. Indeed, there appears to have been no concern by the Board that the attempted fulfillment of this public trust might be rendered ineffective by submission of the issue to negotiation with the very parties whose integrity is in issue.
Second, the Board, in comparing this case to that of Matter of Board of Educ. (Council of Supervisors & Adm’rs) (supra) (which is based upon a shaky analysis at best) acknowledged that the instant questionnaire is perhaps "more directly related to matters of legitimate management concern than the questionnaire considered by PERB,” but, found that "it is sufficiently detailed to constitute a potential intrusion into an individual’s privacy, depending upon that individual’s legitimate expectation of privacy.” Indeed, the apparent incomprehensibility of that statement aside, a simple examination of Matter of Board of Educ. (supra) reveals that the questionnaire there was enormously intrusive, calling, by dozens of questions, for detailed reports of the finances of the employee and the employee’s spouse. Considering the dissimilarity of the government directives at stake, ours being more reasonably related to the interests to be served and also dramatically less intrusive than the Board of Education’s, it is difficult to understand this Board’s facile acceptance of the PERB decision as precedent. I am all the more puzzled by its position, since the Board seems to have concluded that the city’s *740 questionnaire seeks no private information at all. As the Board noted, "[i]t appears that this information involves largely matters of public record which are otherwise accessible to the City, although not in forms which would facilitate collection of debts owed to the City. We believe that the expectation of privacy in such information of an applicant for initial employment is minimal.” No explanation is given in its decision for the conclusion that as to applicants for promotion the very same information is within the expectation of privacy of the employee.
The petition is granted.

. Administrative Code of the City of New York § 1173-4.3 (a) and (b) (now § 12-307 [a], [b]), in pertinent parts, provide:
"a. Subject to the provisions of subdivision b of this section ** * * public employers and certified or designated employee organizations shall have the duty to bargain in good faith on wages * * * hours * * * working conditions * * *
"b. It is the right of the city, or any other public employer, acting through its agencies, to * * * determine the standards of selection for employment * * *. Decisions of the city or any other public employer on those matters are not within the scope of collective bargaining, but, notwithstanding the above, questions concerning the practical impact that decisions on the above matters have on employees, such as questions of workload or manning, are within the scope of collective bargaining.” (Emphasis supplied.)
The New York State Fair Employment Act (Civil Service Law § 204), in pertinent part, provides:
"2. Where an employee organization has been certified or recognized * * * the appropriate public employer shall be, and hereby is, required to negotiate collectively with such employee organization in the determination of * * * the terms and conditions of employment of the public employees * * * and to negotiate and enter into written agreements with such employee organizations in determining such terms and conditions of employment.
"3. For the purpose of this article, to negotiate collectively is the performance of the mutual obligation of the public employer and a recognized * * * employee organization to * * * confer in good faith with respect to wages, hours, and other terms and conditions of employment”.

. It was recently reported that a Parking Violations Bureau program identified some 25,963 employees as owing an aggregate of some $5.7 million in outstanding fines. Included in the list of scofflaws was said to be some 1,300 employees in the Department of Transportation alone. The total number of scofflaws was reported to represent about 10% of all city employees (City Workers Duck 5.7M Parking Fines, NY Daily News, May 3, 1988, at 2).

. Rapp v Carey (44 NY2d 157 [1958]) cited by the Board as authority for its statement of principle is inapposite, for it stands only for the proposition that employees’ rights of privacy are not overborne by unlawfully passed executive orders.