[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Before this Court is an appeal by the Johnston School Committee ("Committee") from a decision of the Rhode Island State Labor Relations Board ("Board"), finding that the Committee committed an unfair labor practice by implementing an "Internet Use Policy" (the "Policy") without engaging in requisite bargaining. Jurisdiction is pursuant to G.L. 1956 § 28-7-29 and G.L. 1956 §42-35-15. Defendants have timely objected.
 Facts and Travel
In 2001, the Committee issued and distributed the Policy, which parents, students, and teachers alike were asked to sign and return. In pertinent part the Policy provides:
 "Internet access is coordinated through a complex association of government agencies, as well as regional and state networks. The smooth operation of the network relies upon the proper conduct of those who use it. In general, this requires efficient, ethical, and legal utilization of the network resources, as well as adherence to school and county codes of conduct. If a user violates any of these provisions, his or her privilege to use the Internet will be terminated and future access could possibly be denied. In a case where codes of conduct or laws are broken, further consequences may follow. Johnston Public Schools will cooperate fully with local, state, or federal officials in any investigation concerning or relating to illegal activities conducted through Johnston Public Schools' Network.
 The signature(s) at the end of this document are legally binding and indicate that the parties who signed have read the terms and conditions carefully and understand their content.
 . . .
 Responsibilities of Staff Members
 It is expected that staff and faculty members in Johnston Public Schools will use the Internet for research and/or instructional purposes. . . . Employee violations of the Internet Use Policy will be handled in accordance with law, school policy, or collective bargaining agreements, as applicable.
 . . .
 Guidelines for Internet Use
 Johnston Public Schools' networks are to be used in a responsible, efficient, and legal manner and must be in support of the educational goals and objectives of Johnston Public Schools and the State of Rhode Island
 . . .
 User: I understand and will abide by Johnston Public Schools' Internet Use Policy. I further understand that any violation of this policy may constitute disciplinary action or criminal offense." (Committee Memo Exhibit B) (Emphasis in Original).
On November 2, 2001, the Johnston Federation of Teachers, AFT, AFL-CIO ("Union") filed an unfair labor practice charge. Following an investigation and informal hearing, the Board determined to issue a Complaint against the Committee on April 29, 2002. A formal hearing was scheduled for May 28, 2002; a decision was rendered on December 11, 2002.
In its decision, the Board concluded that the implementation of the Policy was an unfair labor practice. Specifically, the Board found that the Policy affects the schools' discipline practice, a mandatory subject for bargaining. Furthermore, the Board found that the Policy, to the extent it is legally binding, constituted direct dealing with employees. On these bases, the Board directed that the Committee suspend the use of the policy as applied to teachers and directed the Committee to bargain in connection therewith.
 Standard of Review
The standard of review for this Court's appellate consideration of a decision of the Rhode Island State Labor Relations Board is governed by G.L. § 42-35-15(g) of the Administrative Procedures Act. Said section provides for review of contested agency decisions as follows:
 "The Court shall not substitute its judgment for that of the agency as to the weight of the evidence on the questions of fact. The court may affirm a decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law;
 (5) Clearly erroneous in view of reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
Pursuant to § 42-35-15, the Superior Court acts in the capacity of an appellate court when reviewing a decision of an administrative agency. Mine Safety Appliances Co. v. Berry,620 A.2d 1255, 1259 (R.I. 1993). The Superior Court is confined to "an examination of the certified record to determine if there is any legally competent evidence therein to support the agency's decision." Johnston Ambulatory Surgical Associates, Ltd. v.Nolan, 755 A.2d 799, 805 (R.I. 2000) (quoting Barrington SchoolCommittee v. Rhode Island State Labor Relations Board,608 A.2d 1126, 1138 (R.I. 1992)). If the agency decision was based on sufficient competent evidence in the record, the reviewing court must affirm the agency's decision. Nolan, 755 A.2d at 805 (citing Barrington School, 608 A.2d at 1138). "A judicial officer . . . may reverse [the] findings of the administrative agency only in instances where the conclusions and the findings of fact are `totally devoid of competent evidentiary support in the record,' (Bunch v. Board of Review, 690 A.2d 335, 337 (R.I. 1997); Milardo v. Coastal Resources Management Council,434 A.2d 266, 272 (R.I. 1981), or from the reasonable inference that might be drawn from such evidence." Bunch, 690 A.2d at 337 (quoting Guarino v. Department of Social Welfare, 122 R.I. 583, 588-89, 410 A.2d 425, 428 (1980)). However, questions of law are not binding upon the court and are reviewed de novo.Narragansett Wire Co. v. Norberg, 118 R.I. 596, 376 A.2d 1, 16 (R.I. 1977); Bunch, 690 A.2d at 337.
 Analysis
The Rhode Island Labor Relations Act ("RILRA") prohibits employers from engaging in an unfair labor practice. G.L. 1956 §28-7-13. The RILRA provides in pertinent part that:
 "It shall be an unfair labor practice for an employer to: . . .
 (6) Refuse to bargain collectively with the representatives of employees, subject to the provisions of §§ 28-7-14 — 28-7-19, except that the refusal to bargain collectively with any representative is not, unless a certification with respect to the representative is in effect under §§ 28-7-14 — 28-7-19, an unfair labor practice in any case where any other representative, other than a company union, has made a claim that it represents a majority of the employees in a conflicting bargaining unit. . . .
 (10) Do any acts, other than those already enumerated in this section, which interfere with, restrain or coerce employees in the exercise of the rights guaranteed by § 28-7-12."
This Act, which mirrors its federal counterpart, the National Labor Relations Act, 29 U.S.C. § 1 et al., has been repeatedly interpreted using federal case law as a guide. See Macquattiev. Malafronte, 779 A.2d 633, 636 (R.I. 2001) (citing Belangerv. Matteson, 115 R.I. 332, 338, 346 A.2d 124, 129 (1975), for the proposition that "[b]ecause Rhode Island's labor relations laws parallel federal statutes, this Court has adopted federal case law when appropriate"). Accordingly, this Court will be guided by federal case law in determining whether the Board erred in its decision which found that the Committee, by implementing the Policy, committed an unfair labor practice in violation of RILRA.
 Statutory Duties
The Committee argues that it could not negotiate the Policy's implementation because the Committee, a public agency, is prohibited from "negotiating away" its powers and duties granted by statute. However, the Board contends that the statutory language which obligates the Committee to protect students simultaneously prohibits the Committee from pursuing actions which infringe upon teachers' right to collectively bargain. Furthermore, the Board argues that the implementation of the Policy was not an exercise of the Committee's statutory duty to safeguard school children; instead much of the Policy regulates teachers' non-work-related use of the internet with no correlation to child safety issues.
It is well-settled that an agency's "statutory powers and obligations cannot be abdicated." Vose v. R.I. Bd. ofCorrectional Officers, 587 A.2d 913, 915 (R.I. 1991), seealso State v. R.I. Alliance of Soc. Servs. Employees, Local580, 747 A.2d 465, 469 (R.I. 2000), Pawtucket Sch. Comm. v.Pawtucket Teachers' Alliance, Local No. 930, 652 A.2d 970, 972 (R.I. 1995). Therefore, when an agency acts pursuant to a statutory mandate, the action may not be challenged on the basis that bargaining must occur prior thereto. In each of the above-cited cases, the courts found that challenges to employers' actions, which were authorized by statute but in conflict with the operative collective bargaining agreements, were not unfair labor practices. Also, the action taken in each case was tailored to conform to a specific statutory requirement.
In Vose, the director of the Department of Corrections implemented a policy mandating corrections officers to work involuntary overtime. Vose, 587 A.2d at 913. This policy was implemented in direct response to the rapid increase in the prison population, and pursuant to the director's statutory obligation to ensure the safety, discipline, and care of the inmates. Id. at 914. Specifically, the applicable statute provided in pertinent part: "the director of the department of corrections shall: . . . Make and promulgate necessary rules and regulations . . . regarding nutrition, sanitation, safety, discipline, . . . care, and custody for all persons committed to correctional facilities." G.L. 1956 (1988 Reenactment) §42-56-10(v). The mandatory overtime requirement directly impacted the safety and protection of inmates. Without the imposition of overtime, the prison would be understaffed and under-guarded, compromising the safety, care, and custody of the inmates housed at the facility.
The Soc. Servs. Employees court upheld the decision of the Department of Human Services ("DHS") to change the overtime pay policy. Soc. Servs. Employees., 747 A.2d at 468. This decision responded to a statutory mandate prohibiting the application of paid-sick-leave hours in the computation of overtime compensation. Id. In that instance, the statutory mandate by which DHS purported to act read as follows:
 "Sick leave and other leave — Effect of discharging upon overtime work and overtime compensation . . . In any given pay period in the event that an employee discharges any sick leave or leave of a type referred to in subsection (a) of this section, either with pay or without pay, he or she shall be permitted to work overtime only after he or she has worked his or her full thirty-five (35) or forty (40) hours, whichever is appropriated for the job classification." G.L. 1956 § 36-4-63(b).
Again, DHS's action was a direct and specific response to the statutory mandate, demanding no more than that articulated in the statute.
Finally, in Pawtucket Sch. Comm., the court overruled a challenge to a policy implemented by the Pawtucket School Committee, which required teachers of the English as a Second Language Program to submit copies of their lesson plans.Pawtucket Sch. Comm., 652 A.2d at 971. Again, the PawtucketSch. Comm. court found that this policy was targeted at fulfilling the statutory obligation to provide eligible students with classes and programs which combat English-language proficiency problems. Id. at 972 (citing, G.L. 1956 (1988 Reenactment) § 16-54-2). Specifically, § 16-54-2 imposed the following duties on the Committee:
 "Duty of the school committee. — In any city or town where there is a child who is eligible to attend elementary or secondary schools, and whose English proficiency is limited to such a degree that it impedes his/her academic progress, the school committee of the city or town shall provide those special services and programs which satisfy the needs of the child with limited-English proficiency, in such programs and services as approved by the department of elementary and secondary education in accordance with rules and regulations promulgated by the board of regents for elementary and secondary education." G.L. 1956 (1988 Reenactment) § 16-54-2.
Again, the Committee's response in that case was specifically tailored to ensure that the needs of children lacking proficiency in English were not neglected, thereby fulfilling its obligations under § 16-54-2.
In the instant case, the Committee purported to implement the Policy pursuant to the general duties and obligations of the Committee as enumerated in G.L. 1956 § 16-2-9. This statute provides in pertinent part:
 "(a) The entire care, control, and management of all public school interests of the several cities and towns shall be vested in the school committees of the several cities and towns. School committees shall have, in addition to those enumerated in this title, the following powers and duties:
 . . .
 (2) To develop education policies to meet the needs of the community.
 . . .
 (8) To provide for the location, care, control, and management of school facilities and equipment.
 (16) To establish standards for conduct in the schools and for disciplinary actions.
 . . .
 (20) To establish policies governing curriculum, courses of instruction, and text books." § 16-2-9
The record reflects that the Committee did not implement the Policy to comport with a specific statutory mandate as in the cases discussed previously. Rather, the Policy, as implemented, exceeded the general obligations enumerated in § 16-2-9, which provide for the management of public schools and establishment of curricula. Specifically, the prohibition of internet use for purposes other than instruction, falls outside the obligations imposed under § 16-2-9 to develop educational policies. Rather, this prohibition concerns certain conditions of employment. Therefore, the Policy was not tailored with sufficient specificity to meet the requirements of § 16-2-9 only.
Not only has the implementation of the Policy exceeded these general requirements, but it has also violated the very substance of § 16-2-9. The duties and obligations enumerated in § 16-2-9
are specifically limited to ensure the protection of the teachers' right to bargain. Section 16-2-9(b) states "[n]othing in this section shall be deemed to limit or interfere with the rights of teachers and other school employees to collectively bargain pursuant to chapters 9.3 and 9.4 of title 28 or to allow any school committee to abrogate any agreement reached by collective bargaining." As fully discussed later, this Court finds the implementation of the Policy pertains to subjects of mandatory bargaining. Therefore, the implementation of a policy, without negotiation, interfered "with the rights of teachers and other school employees to collectively bargain pursuant to chapters 9.3 and 9.4 of title 28." Accordingly, the Policy violated § 16-2-9(b).
The Committee also purported to act pursuant to § 16-2-9(3) which obligates the Committee: "[t]o provide for and assure the implementation of federal and state laws, the regulations of the board of regents for elementary and secondary education, and of local school policies, programs, and directives." In accordance with this section, the Committee attempted to comply with the Children's Online Protection Act ("COPA"), 44 U.S.C. § 254. COPA provides the following:
 "(5) Requirements for certain schools with computers having Internet access.
 (A) Internet safety.
 (i) In general. Except as provided in clause (ii), an elementary or secondary school having computers with Internet access may not receive services at discount rates under paragraph (1)(B) unless the school, school board, local educational agency, or other authority with responsibility for administration of the school —
 (I) submits to the Commission the certifications described in subparagraphs (B) and (C);
 (II) submits to the Commission a certification that an Internet safety policy has been adopted and implemented for the school under subsection (l); and
 (III) ensures the use of such computers in accordance with the certifications." 47 U.S.C. § 254(h)(5)(A).
COPA clearly requires that an internet safety policy be adopted by all schools which are provided with discounted internet service.[1] However, compliance with COPA is relatively undemanding, as COPA imposes relatively few conditions. Specifically, COPA requires:
 "(B) Certification with respect to minors. A certification under this subparagraph is a certification that the school, school board, local educational agency, or other authority with responsibility for administration of the school —
 (i) is enforcing a policy of Internet safety for minors that includes monitoring the online activities of minors and the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are —
 (I) obscene;
 (II) child pornography; or
 (III) harmful to minors; and
 (ii) is enforcing the operation of such technology protection measure during any use of such computers by minors.
 (C) Certification with respect to adults. A certification under this paragraph is a certification that the school, school board, local educational agency, or other authority with responsibility for administration of the school —
 (i) is enforcing a policy of Internet safety that includes the operation of a technology protection measure with respect to any of its computers with Internet access that protects against access through such computers to visual depictions that are —
 (I) obscene; or
 (II) child pornography; and
 (ii) is enforcing the operation of such technology protection measure during any use of such computers." 47 U.S.C. § 254(h)(5)(B), 47 U.S.C. § 254(h)(5)(C).
The record demonstrates that the Committee has exceeded the conditions proscribed by COPA. The restrictions imposed by COPA are limited to the protection of students from obscene material, including child pornography. COPA does not seek to restrict the casual personal use of the internet. Nevertheless, such a restriction is included in the Policy implemented by the Johnston School Committee. The Policy states: "[i]t is expected that staff and faculty members in Johnston Public Schools will use the Internet for research and/or instructional purposes. . . . [Furthermore,] Johnston Public Schools' networks . . . must be [used] in support of the educational goals and objectives of Johnston Public Schools and the State of Rhode Island" (Committee Memo Exhibit B).
The specific goal of COPA is to combat the growing problem of "distribution over the Internet of obscene material, child pornography, and [other] harmful . . . material. Law enforcement resources at the state and federal level have been focused nearly exclusively on child pornography and child stalking." (Committee's Exhibit A). However, the Policy has gone above and beyond the requirements of COPA and into the realm of subjects unrelated to student safety. Therefore, the Policy was not tailored, as argued, to comply with the conditions imposed by COPA.
In the instant case, the Board concluded
 "This policy is long on rhetoric and `feel good' language, but short on procedural protections or due process for the `accused'. In this day and age, such a policy may, in fact, make a parent or governmental agency feel warm and fuzzy about its efforts to fight pornography and protect children. The Employer's claim that this is just an `educational policy' rings hollow when its employees' basic property rights in their jobs are being implicated without representation. Requiring an Employer to bargain over the implementation of a policy, the violation of which could negatively impact a person's employment, in no way impacts or `bargains away' the Employer's statutory powers or duties.
 Moreover, while it is true that COPA requires that an Internet Safety Policy be adopted and RINET requires the use of a filtering device, the Employer's own evidence, in this case, recommends that the particular Internet policies be voluntarily implemented, (likely because when all parties `buy into' a policy, it is more likely to be effective). There is clearly wide discretionary latitude in the type of language that should or must be incorporated into `Internet Safety Policies' and `Internet Acceptable Use Polices' (which, to this Board seems to suggest two types of policies). This Board can find no reason why the safety of children would be compromised, in any way, by having a policy that has been partially bargained, as it pertains to the terms and conditions of employment of the teachers." (Board Decision at 4).
Accordingly, this Court finds that reliable, probative, and substantial evidence supported the Board's decision which found that the Committee's argument "rings hollow" in its assertion that the policy was simply an "educational policy" implemented in accordance with its statutory duties. Furthermore, this Court finds that the legal standard applied by the Board to the evidence presented on this issue was not affected by error of law.
 Terms and Conditions of Employment — Mandatory Bargaining
The Committee asserts that the implementation of the Policy did not change the terms and conditions of the teachers' employment and, therefore, is not a subject of mandatory bargaining. In support thereof, the Committee contends that the Policy asks no more of the teachers than was already required under the operative Collective Bargaining Agreement ("CBA"). Furthermore, the Committee argues that although the Policy describes discipline measures to be taken in the event of an infraction of the Policy by one of the teachers, the Policy would not be actually enforced in a manner inconsistent with the CBA. Therefore, the Committee argues that the Board improperly applied the law in determining that the implementation of the Policy was a mandatory subject of bargaining and constituted an unfair labor practice.
The Board argues that the Policy, as implemented, affects the terms and conditions of employment. Specifically the Board maintains that the teachers' ability to use the internet service provided by the school and the disciplinary measures imposed on the teachers for any violations of the policy are both affected.
Subjects which implicate collective bargaining can be categorized into three general subjects: mandatory subjects of bargaining, permissive subjects of bargaining, and illegal subjects of bargaining. Hill-Rom Co. v. NLRB, 957 F.2d 454, 457 (7th Cir. 1992) (citing generally NLRB v. Wooster Div. ofBorg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958)). The United States Supreme Court has held that employers are prohibited from unilaterally changing any provision of a CBA which involves a mandatory subject of bargaining. AlliedChemical Alkali Workers v. Pittsburg Plate Glass Co.,404 U.S. 157, 185, 92 S.Ct. 383, 400 (1971). Mandatory subjects of bargaining have not been enumerated in a comprehensive list, rather in each case, courts examine whether the issue "settle[s] an aspect of the relationship between the [employer] and employees." Id. at 178, 357. This definition was refined to include those subjects which are "plainly germane to the working environment" and do not involve "managerial decisions, which lie at the core of entrepreneurial control." Ford Motor Co. v.NLRB, 441 U.S. 488, 498, 99 S.Ct. 1842, 1850 (1979).
In Medicenter, Mid-South Hosp., 221 N.L.R.B. 670, 676 (1975), the NLRB, citing Fibreboard Paper Products Corp. v. N.L.R.B.,379 U.S. 203 (1964), applied this definition to distinguish between those subjects falling under managerial control and those issues constituting mandatory subjects of bargaining. The NLRB stated:
 "An employer's `inherent' right to conduct his business has been cabined in many ways by the Act. His `inherent' right to discharge employees is subject to bargaining about the manner in which he does so and the causes on which the discharge may be premised, as well as procedures enabling the employee to challenge the employer's justification for meting out, in a given case, this industrial equivalent of capital punishment. It might as well be argued that the adoption by an employer of a system to denote the number of penalty points to be assigned to absences and tardiness, found to be a mandatory subject in Wellman Industries, Inc., 211 NLRB 639 (1974), or the abandonment of a rule that an employee acquitted of misconduct in a criminal trial will not be discharged for the same offense, involve `inherent' employer rights and therefore are not mandatory bargaining subjects.
 In Fibreboard Paper Products Corp. v. N.L.R.B., 379 U.S. 203 (1964), the Supreme Court held that what might indiscriminately be labeled an employer's `inherent' right to subcontract work was, in the circumstances of the case, a matter about which the employer was required to bargain; the Court noted that this constraint `would not significantly abridge [the employer's] freedom to manage the business' (379 U.S. at 213). In his concurring opinion, Justice Stewart sought to define the kind of managerial prerogative which, although its exercise may affect employee job security, is nevertheless subject to unfettered employer discretion. He described that enclave of discretion as `managerial decisions which lie at the core of entrepreneurial control,' such as `[decisions] concerning the volume and kind of advertising expenditures, product design, the manner of financing and sales,' `[decisions] concerning the commitment of investment capital and the basic scope of the enterprise,' and `those management decisions which are fundamental to the basic direction of a corporate enterprise or which impinge only indirectly upon employment security' (379 U.S. at 223)."
In this case, the Policy does not implicate any of the decisions enunciated by Justice Steward in Fibreboard. The decision to implement the policy, which relates to the teachers' use of the internet, clearly affects the terms and conditions of employment. Engaging in negotiations with regard to the Policy "would not significantly abridge [the employer's] freedom to manage the business." Fibreboard, 379 U.S. at 213.
Conversely, in United Technologies Corp. 278 N.L.R.B. 306, 308 (1986), cited by the Committee, the NLRB found that the employer did not alter the terms and conditions of employment by implementing a policy regarding the company's healthcare plan. The NLRB stated:
 "the Correct-A-Bill program implemented by the Respondent was of limited duration. It did not constitute a change in any health care service covered by the Respondent's health insurance plan nor did it otherwise affect the terms of the plan itself. Instead, it merely provided employees with an incentive to review their hospital or surgical center bills to detect overbilling for services received during the program year. It therefore was likely to affect only a small number of employees in the unit. Here, the fact that only one of the approximately 3600 employees in the bargaining unit received any payment during the first 9 months of the program demonstrates the very limited impact that the program had on bargaining unit employees." Id.
Nevertheless, this fact pattern can be easily distinguished from that before this Court. The Policy implemented by the Committee was not of limited duration. In addition, the Policy clearly affected the terms and conditions of employment, specifically the disciplinary policy and the teachers' use of the school equipment. The implications in the instant case are much more extensive than those in United Technologies.
In addition, courts have consistently held that modifications of disciplinary rules and codes of conduct fall within the guise of mandatory subjects of bargaining. Beverly Health Rehab.Servs. v. NLRB, 297 F.3d 468, 479 (6th Cir. 2002) (finding "company rules concerning employee discipline" are mandatory subjects of bargaining), NLRB v. Amoco Chemicals Corp.,529 F.2d 427, 431 (5th Cir. 1976) (finding "written reprimand disciplinary system constituted a significant change in the terminal employees' working conditions" and was therefore a mandatory subject of bargaining), Electri-Flex Co. v. NLRB,570 F.2d 1327, 1333, 97 L.R.R.M. 2888 (7th Cir. 1978) (finding "the institution of a new system of discipline is a significant change in working conditions, and thus is one of the mandatory subjects for bargaining").
This Policy has an enormous impact on the employee disciplinary policy. The Policy clearly indicates that violations of any of the terms, which includes casual personal use of the internet, would be subject to "disciplinary action or criminal offense." (Committee's Exhibit B). Pursuant to Justice Stewart's definition, this Policy impinges directly upon employment security. Therefore, the Policy clearly implicates mandatory subjects of bargaining.
The Committee's argument that the Policy as it is written would not be enforced — namely, that the teachers would not be disciplined for occasional personal use of the computers — is without merit. The document expressly states that "[t]he signature(s) at the end of this document are legally binding and indicate that the parties who signed have read the terms and conditions carefully and understand their content." Under Rhode Island law, courts must give effect to the plain, ordinary meaning of the contractual terms, which in this instance indicates a binding agreement, not an acknowledgement. R.I.Depositors Econ. Prot. Corp. v. Coffey Martinelli, Ltd., 821 A.2d at 226. See also Perry v. Garey, 799 A.2d at 1023. Therefore, reliance on the language of the Policy, as opposed to the number of teachers who were actually disciplined, was not clearly erroneous.
The Board found, in the instant case, that the Policy "affects discipline, a mandatory subject of bargaining . . . [and] directed [the Committee] to cease and desist use of this particular Internet Use Policy as it pertains to its employees." In making these conclusions of law, the Board pointed to specific language contained in the Policy, including:
 "If a user violates any of these provisions, his or her privilege to use the Internet will be terminated and future access could possibly be denied. In a case where codes of conduct or laws are broken, further consequences may follow.
 It is expected that staff and faculty members in Johnston Public Schools will use the Internet for research and/or instructional purposes. . . . Employee violations of the Internet Use Policy will be handled in accordance with law, school policy, or collective bargaining agreements, as applicable.
 I understand and will abide by Johnston Public Schools' Internet Use Policy. I further understand that any violation of this policy may constitute disciplinary action or criminal offense." (Committee Memo Exhibit B).
Accordingly, this Court finds the Board's determination that the Policy involved subjects of mandatory bargaining was supported by reliable, probative, and substantial evidence. Furthermore, this Court finds that the legal standard applied by the Board to the evidence presented was not affected by error of law.
 Direct Dealing
The Committee argues that it did not engage in direct dealing because the Policy merely underlined the extant rules; therefore, the signing of the Policy did not constitute dealing, and thus could never constitute direct dealing. The Board, however, argues that the Committee engaged in direct dealing with union employees in violation of the RIRLA, when it required teachers to sign a Policy, which, according to its terms, was legally binding.
Under applicable labor law, employers are prohibited from directly bargaining with employees who are represented by a union official. G.L. 1956 § 28-7-13(6), see also Inland Tugs v.NLRB, 918 F.2d 1299, 1310 (7th Cir. 1990). The Inland Tugs
Court stated:
 "An employer's statutory duty to bargain collectively with its employees' representative is an exclusive one. 29 U.S.C. § 159(a). That is to say, the Act requires that the employer recognize that `the statutory representative is the one with whom it must deal in conducting bargaining negotiations, and that it can no longer bargain directly or indirectly with the employees.' General Elec. Co., 150 N.L.R.B. 192, 194 (1964), enforced, 418 F.2d 736 (2d Cir. 1969). Thus, it is an established tenet of labor law that an employer violates its `negative duty to treat with no other [than the employees' chosen representative]' if it bargains or deals directly with employees." Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 684-88, 88 L.Ed. 1007, 64 S.Ct. 830 (1944) (quoting Labor Board v. Jones Laughlin Corp., 301 U.S. 1, 44, 81 L.Ed. 893, 57 S.Ct. 615 (1937)).
Direct dealing operates to "undermin[e] the authority of the union's bargaining representatives. . . . Such tactics are inherently divisive; they make negotiations difficult and uncertain; they subvert the cooperation necessary to sustain a responsible and meaningful union leadership." NLRB v. GeneralElec. Co., 418 F.2d 736, 755, 72 L.R.R.M. 2530 (2nd Cir. 1969).
The Committee's argument that the signature requirement served as a mere acknowledgement of the extant terms and conditions is without merit. This Court has already determined that the Policy functioned as more than a reminder of the extant terms, rather the Policy altered the terms and conditions of employment. Also, federal courts have rejected this same argument in the context of labor disputes. Scepter Inc. v. NLRB, 280 F.3d 1053, (D.C. Cir. 2002) (finding that an employer violated the NLRA when it implemented a new policy to be signed by its employees, despite the fact that the employer argued that the signatures acted merely as acknowledgment of the policy).
As discussed previously, the Policy at issue involves subjects of mandatory bargaining. Therefore, any discussions regarding the Policy constitute dealing, and discussions between employer and employees without proper representation constitute direct dealing. In the instant case, the Committee directly approached the teachers seeking their acceptance of the Policy, which unilaterally changed the terms and conditions of employment. Accordingly, the Committee engaged in direct dealing in violation of RIRLA.
In the instant case, the Board found that these actions constituted direct dealing with represented employees. Specifically the Board stated:
 "As to the claim that the policy constitutes a separate `stand alone contract', the Board has considered this issue carefully. While there are any number of forms or documents that teachers must sign, which are incidental to their employment, the form in this case rises to a different level. On its face, the policy states that the signatures are `legally binding'. This is not the normal type of form that represented employees are required to sign, absent bargaining. In addition, this type of language is clearly not just an `acknowledgment' that the teachers have received a copy of the policy, as argued by the Employers." (Board Decision at 4-5).
Accordingly, this Court finds the Board's decision with regard to the Committee's direct dealings with its represented employees was supported by reliable, probative, and substantial evidence. Furthermore, this Court finds that the legal standard applied by the Board to the evidence presented was not affected by error of law.
 Conclusion
After review of the entire record, this Court finds that the decision directing the Committee to bargain was supported by reliable, probative, and substantial evidence and was not affected by error of law. Substantial rights of the Committee have not been prejudiced. Accordingly, the decision of the Board is affirmed.
Counsel shall submit the appropriate judgment for entry.
[1] RINET provides internet service to the Johnston Public Schools without charge.